2020 UT App 23

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
MARK BOYER,
Appellant.

Opinion
No. 20170423-CA
Filed February 13, 2020

Third District Court, Salt Lake Department
The Honorable Mark S. Kouris
No. 131902296

Elizabeth Hunt, Attorney for Appellant

Sean D. Reyes and John J. Nielsen, Attorneys
for Appellee

Troy L. Booher and Freyja Johnson, Attorneys for
Amicus Curiae Victim V.M.

JUDGE DIANA HAGEN authored this Opinion, in which
JUDGES GREGORY K. ORME and MICHELE M. CHRISTIANSEN
FORSTER concurred.

HAGEN, Judge:

¶1 A jury convicted Mark Boyer of aggravated sexual abuse of a child, rape of a child, and sodomy upon a child. He now appeals, arguing that the district court abused its discretion in denying his motion for a new trial based on ineffective assistance of counsel. He also argues that the district court erred in denying his motions to recuse and to reconstruct the record. Because we are unpersuaded that trial counsel provided ineffective assistance or that the district court erred in its evidentiary and recusal rulings, we affirm.

BACKGROUND[1]

¶2 Boyer appeals his convictions resulting from an investigation and prosecution that together spanned more than three years. In early 2013, Boyer's ex-wife (the ex-wife) contacted the Utah Division of Child and Family Services (DCFS) and reported that, years earlier when she and Boyer were still married, Boyer had sexually abused their son's now fourteen-year-old friend (the victim). In response to this report, a detective from Unified Police Department (the detective) interviewed the victim at the Children's Justice Center (the CJC). The ex-wife drove the victim to the CJC, and the victim provided the detective with a written account of Boyer's abuse, which the victim had prepared prior to the interview at the suggestion of the ex-wife, who expressed concern that the victim would struggle to talk about the abuse.

¶3 During the interview, the victim disclosed to the detective that Boyer had begun abusing her when she was seven years old and that the most recent incident of abuse occurred when she was nine. Each incident occurred at Boyer's home when the victim was visiting Boyer's son. The victim described at least seven separate incidents of sexual abuse in graphic detail. Because the details of Boyer's crimes are not relevant to the issues on appeal, we do not repeat them here.

¶4 The State subsequently charged Boyer with four counts of aggravated sexual abuse of a child, four counts of rape of a child, and two counts of sodomy upon a child. The victim testified at a preliminary hearing in May 2013, and Boyer was bound over on all charges except one count of rape of a child.

---

1. "On appeal from a jury verdict, we view the evidence and all reasonable inferences in a light most favorable to that verdict and recite the facts accordingly." *State v. Pinder*, 2005 UT 15, ¶ 2, 114 P.3d 551 (cleaned up).

¶5      Before Boyer's first trial, trial counsel made numerous pretrial motions, including a motion opposing the State's request to photograph Boyer's genitals, two motions to admit evidence of the victim's prior allegations of sexual abuse pursuant to rule 412 of the Utah Rules of Evidence, a motion to produce the victim's medical records from 2005 to 2009, a motion to exclude the State's expert testimony, and a motion to continue to allow more time to investigate rule 412 evidence and the State's expert. Trial counsel also negotiated a stipulation with the State allowing for the in camera review of the victim's medical and mental health records. After the in camera review, the district court determined that the records contained no exculpatory material and shredded the documents.

¶6      The case proceeded to trial in May 2016. The State presented the testimony of the victim's aunt—her legal guardian at the time of trial—as well as the testimony of the victim. The victim testified to the details of each of the offenses and described her relationship with Boyer's family and the difficulties she faced since disclosing the abuse. During direct examination by the State, the victim testified that she decided to tell the ex-wife about Boyer's abuse because she overheard a conversation about Boyer and a "lady" that made her suspect that she "wasn't the only one." After the victim's direct examination, trial counsel asked for a recess and moved for a mistrial because the victim's statement constituted inadmissible and prejudicial evidence that could lead the jury to infer that Boyer had committed similar crimes against other victims. The district court granted Boyer's motion and declared a mistrial.

¶7      The second trial took place a short time later. The victim again testified about the details of Boyer's abuse and her struggles since. The State admitted photos of Boyer's genitals, and during cross-examination, trial counsel questioned the victim about her claim to investigators that Boyer had one or two moles near his penis. Trial counsel also questioned the victim about the ex-wife's suggestion that she write down the abuse

allegations before her CJC interview and the ex-wife's influence in the victim's life. Among other things, the victim admitted on cross-examination that she had believed that she had genital herpes because the ex-wife told the victim that Boyer had genital herpes and told her about the symptoms.

¶8 The ex-wife testified that the victim repeatedly told her that she had something to tell her before the victim ultimately disclosed Boyer's abuse. Although the ex-wife did not initially believe the victim, she eventually encouraged the victim to speak with the detective. The ex-wife explained that she suggested that the victim write down the allegations before her CJC interview because the victim had difficulty telling her story. The ex-wife also admitted that she told the victim that Boyer had genital herpes.

¶9 During direct examination, the ex-wife testified that the victim disclosed that one of the incidents of abuse occurred on blue-and-white-striped sheets. Although she initially doubted the veracity of the victim's allegations, the ex-wife later discovered that she and Boyer did have blue-and-white-striped sheets. She testified that upon her discovery, "I was floored. I was—it was just those things that just happen that made me more aware that she was telling the truth." Trial counsel objected to this statement, and the district court sustained the objection and struck the statement from the record. During cross-examination, trial counsel questioned the ex-wife about the sheets, her suggestion that the victim write down the allegations against Boyer, and her account of finding the victim crying on the floor of her bathroom during the time period of the abuse. After the ex-wife completed her testimony, trial counsel moved for a mistrial on the basis of her bolstering statement, which the court had stricken. The court denied the motion for a mistrial, determining that the statement was harmless, but offered to instruct the jury that it alone could determine the credibility of a witness. Trial counsel declined the instruction for fear of drawing further attention to the statement.

¶10    Following the denial of the motion for a mistrial, the State presented expert testimony from a psychiatrist specializing in sexual abuse cases. The State concluded its case with testimony from the nurse who conducted a physical examination of the victim following her CJC interview. The nurse testified that the victim's exam was normal, but explained that ninety-five percent of the exams she conducts are normal.

¶11    After the State rested, the defense called the detective as its first witness. The detective testified about the extensive professional training he underwent to work with child victims and the nationally recognized protocol for interviewing suspected child sexual abuse victims. After the detective testified, the defense read into evidence a stipulation that the victim had informed the police "about a separate incident" in which another friend's father touched her breasts. The stipulation indicated "that [the incident] only happened on one occasion," that the friend's father has denied the allegation, and that "no charges have been filed against" the friend's father.

¶12    Boyer testified last and denied the victim's allegations. He testified that his divorce from the ex-wife had been acrimonious and that, shortly before the victim's accusations, one of his sons sent him a photograph of the ex-wife apparently passed out on the kitchen floor after taking a sleeping pill and possibly consuming alcohol. Boyer believed that the victim's allegations resulted from the ex-wife's desire for retribution. To rebut this evidence, the State recalled the ex-wife, who testified that, while she did force Boyer out of their home, occasionally drank, and took Ambien, her divorce from Boyer was otherwise amicable and there were no custody disputes.

¶13    In closing arguments, the defense argued that the ex-wife had indoctrinated the victim to make false allegations against Boyer so that the ex-wife could keep Boyer from seeing their sons. The defense further argued that the victim did not know that Boyer had genital herpes until the ex-wife told her and

never sought medical treatment for her supposed herpes outbreaks, did not mention the moles near Boyer's penis in her initial interviews or until much later in the investigation when she described Boyer's moles inaccurately, showed no physical signs of abuse, and accused another friend's father of similar conduct yet no charges were filed. The defense also pointed out that the State's expert had opined that consistency and rich detail in reports could be an indication of indoctrination.

¶14    After closing arguments, the jury found Boyer guilty on all counts. Boyer was later sentenced to two consecutive terms of fifteen years to life in prison for sodomy upon a child and for aggravated sexual abuse of a child, to run concurrently with the lesser sentences imposed for the remaining counts.

¶15    After sentencing, trial counsel withdrew and appellate counsel appeared on Boyer's behalf.[2] Appellate counsel filed a motion for a new trial, arguing ineffective assistance of trial counsel, evidentiary errors, and prosecutorial misconduct. Appellate counsel also moved to disqualify the trial judge from hearing the motion for a new trial, arguing that the trial judge was actually and apparently biased. In addition, appellate counsel filed a motion to subpoena all of the victim's medical and mental health records from 2005 forward and a motion to reconstruct the record with the victim's medical and mental health records that the district court previously reviewed in camera and subsequently destroyed.

¶16    The district court initially granted the motions to subpoena the victim's medical records and to reconstruct the record but reconsidered its ruling at the urging of the victim's counsel and the State. The motion to disqualify was certified to the presiding judge, who denied the motion. The district court

---

2. The same attorney who represents Boyer on appeal also represented Boyer post-sentencing in the district court.

then considered briefing and argument on the motion for a new trial and denied that motion as well.

¶17 Boyer appeals.

ISSUES AND STANDARDS OF REVIEW

¶18 On appeal, Boyer challenges three rulings. First, Boyer argues that the district court erred in denying his motion for a new trial on various grounds. "When reviewing a trial court's denial of a motion for a new trial, we will not reverse absent a clear abuse of discretion by the trial court." *State v. Pinder*, 2005 UT 15, ¶ 20, 114 P.3d 551 (cleaned up). "At the same time, however, we review the legal standards applied by the trial court in denying such a motion for correctness" and "the trial court's factual findings for clear error." *Id.* Accordingly, a trial court abuses its discretion if its decision is "premised on flawed legal conclusions," *Archuleta v. Galetka*, 2011 UT 73, ¶ 152, 267 P.3d 232 (cleaned up), "if the trial court's decision was beyond the limits of reasonability[,] . . . if the trial court's actions are inherently unfair[,] or if we conclude that no reasonable person would take the view adopted by the trial court," *State v. Arguelles*, 2003 UT 1, ¶ 101, 63 P.3d 731 (cleaned up).

¶19 Second, Boyer argues that the district court denied his constitutional right to a fair trial in denying his motion to disqualify because the trial judge was actually or apparently biased. Whether the district court erred in declining to disqualify the trial judge on the basis of bias is a question of law, which we review for correctness. *State v. Alonzo*, 973 P.2d 975, 979 (Utah 1998).

¶20 Finally, Boyer argues that the district court erred in refusing to reconstruct the record with the victim's subpoenaed medical and mental health records. Boyer makes this argument under article I, section 12 of the Utah Constitution. Issues of

constitutional interpretation are also questions of law that we review for correctness, "granting no deference to the district court." *Sandoval v. State*, 2019 UT 13, ¶ 7, 441 P.3d 748.

## ANALYSIS

### I. Motion for a New Trial

¶21 Boyer contends that the district court erred in denying his motion for a new trial because he was prejudiced by the cumulative effect of nearly two dozen instances of ineffective assistance of counsel, prosecutorial misconduct, and district court error. Under the Utah Rules of Criminal Procedure, a district court "may, upon motion of a party or upon its own initiative, grant a new trial in the interest of justice if there is any error or impropriety which had a substantial adverse effect upon the rights of a party." Utah R. Crim. P. 24(a). "Before reversing a verdict or sentence under the cumulative error doctrine," a court must make three determinations: "that (1) an error occurred, (2) the error, standing alone, has a conceivable potential for harm, and (3) the cumulative effect of all the potentially harmful errors undermines its confidence in the outcome." *State v. Martinez-Castellanos*, 2018 UT 46, ¶ 42, 428 P.3d 1038. "The doctrine will only be applied to errors that are 'substantial' enough to accumulate." *Id.* ¶ 40.

¶22 Here, Boyer argues that three types of error accumulate to warrant a reversal and a new trial—ineffective assistance of counsel, prosecutorial misconduct, and erroneous evidentiary and procedural rulings. These issues tend to overlap and involve common facts. Although the relationship between Boyer's scattershot claims is not always clear, we have attempted to group issues together as they relate to different parts of the trial. We first address the issues related to other allegations of sexual abuse under rule 412, the admission of the psychiatrist's expert testimony, and the production of the victim's medical and

mental health records. In so doing, we recite additional facts as necessary to provide context. We then address the remaining ineffective assistance claims as a group and conclude that they do not merit further discussion.

A.     Rule 412 Evidence

¶23     Around the same time the victim disclosed Boyer's abuse to the ex-wife and the detective, the victim also reported being sexually abused by a cousin (the cousin incident). Specifically, the victim reported that she and her cousin went for a bicycle ride when she was roughly five years old. The two stopped at a trailer, and the cousin pulled down the victim's pants and rubbed her vagina with his fingers. The State disclosed these allegations to the defense in 2013.

¶24     A short time after her first CJC interview with the detective, the victim also disclosed another incident in which another friend's father touched her breasts over her bra one time during a sleepover at his house (the sleepover incident). After disclosing the sleepover incident to the detective in an interview, the victim provided a letter to a district attorney's office investigator who passed it on to the detective. In the letter, the victim described the sleepover incident as well as an incident where the friend's father invited the victim into his office to help organize papers. The victim alleged that while in the office, the friend's father rubbed the victim's leg, put the victim on his lap, made the victim lie down, rubbed the front of her body, and put his hands down her pants (the office incident). The detective documented both incidents involving the friend's father in his reports and referenced the letter in one of the reports. The State provided trial counsel with both reports before trial but did not provide a copy of the letter.

¶25     Trial counsel filed motions to admit evidence of both the cousin incident and the sleepover incident under rule 412 of the Utah Rules of Evidence. The first motion pertained to the cousin

incident. Trial counsel argued that the district court should allow evidence of the victim's allegations to be admitted at trial because the victim alleged she was abused by cousin in a "similar fashion" as Boyer was alleged to have abused the victim, "family members minimized the abuse and were not cooperative with law enforcement in the prosecution of the relative," and the allegations were admissible under rule 412 if they were false and under rule 412(b) "to negate the sexual innocence inference." The district court denied the motion. Boyer made similar arguments in his motion to admit evidence of the sleepover incident. But at the hearing on the motion, trial counsel and the State agreed that the jury would be informed of the victim's allegations about the sleepover incident by written stipulation,[3] leaving the parties free to argue about how to interpret such evidence. At trial, the defense read the stipulation into evidence, informing the jury that the victim alleged that the father of another friend had touched her breasts, that it happened only once, and that the State declined to file charges.

¶26 During closing argument, trial counsel argued that the stipulated evidence of the victim's other allegation showed that the victim was capable of fabricating allegations of sexual abuse. The prosecutor responded in rebuttal by contesting the defense's

---

3. It is not clear from the record why defense counsel did not seek to admit evidence of the office incident. In direct conflict with some of his other arguments, Boyer argues that defense counsel erroneously believed that the office incident occurred not between the victim and her friend's father but between the victim and her friend because the detective erroneously stated as much in his report. Boyer also argues that, if trial counsel had investigated the letter, he would have realized that the office incident involved the friend's father. However, in an unsigned affidavit submitted with Boyer's motion for a new trial, trial counsel stated that he understood that the office incident involved the friend's father and not the friend.

characterization of the victim's allegation pertaining to the sleepover incident:

> This is [a] perfect example of why logic and the application of logic is [so] important in this case as you go through your deliberations, because if the incident occurred—if it really did happen the way [the victim] said to [the detective], even though it was determined, oh, well, there's not enough evidence to charge. There's no [ex-wife] to give us those—

At that point, trial counsel objected, arguing that the State had broken the stipulation by attempting to talk about the ex-wife's lack of involvement in the other allegation. The district court sustained the objection.

¶27 On appeal, Boyer makes several arguments pertaining to the victim's pretrial allegations of other incidents of sexual abuse perpetrated by individuals other than Boyer. He argues that the State engaged in prosecutorial misconduct in mischaracterizing the office and sleepover incidents at the hearing on the rule 412 motion and refusing to turn over the letter. He also argues that trial counsel provided ineffective assistance by failing to investigate the office incident, failing to object to the prosecutor's representations at the rule 412 hearing, and stipulating only to the admission of the sleepover incident.

¶28 Each of Boyer's claims relating to the victim's other allegations assumes that evidence of those allegations would have been admissible as an exception to rule 412.[4] If this

---

4. Boyer also argues that the State engaged in prosecutorial misconduct during rebuttal closing argument when the prosecutor appeared to begin to disclose facts outside the stipulation in stating, "There's no [ex-wife] to give us those—."

(continued…)

evidence was not admissible, the prosecution's alleged failure to disclose and defense counsel's alleged failure to investigate and use this evidence more effectively could not have impacted the trial's outcome. Thus, we address the admissibility of the victim's allegations as a threshold matter and conclude that because the allegations were not admissible, any alleged missteps with respect to this evidence did not prejudice Boyer.

¶29    Rule 412 "serves to bar all evidence of [an] alleged victim's other sexual behavior, 'whether offered as substantive evidence or for impeachment,'" *State v. Clark*, 2009 UT App 252, ¶ 14, 219 P.3d 631 (quoting Utah R. Evid. 412 advisory committee's note), including "any truthful evidence that involves actual physical conduct or that implies sexual contact," *id.* ¶ 20 (cleaned up), and "all evidence that may have a sexual connotation for the fact finder," *State v. Tarrats*, 2005 UT 50, ¶ 22, 122 P.3d 581 (cleaned up). However, there are exceptions to rule 412's bar, one of which Boyer argues applies here.

¶30    Rule 412(b)(3) allows for the admission of evidence of an alleged victim's other sexual behavior if the exclusion of such

---

(…continued)

Because our supreme court has recognized that "prosecutorial misconduct is not 'a standalone basis for independent judicial review,'" *State v. Reid*, 2018 UT App 146, ¶ 40, 427 P.3d 1261 (quoting *State v. Hummel*, 2017 UT 19, ¶ 111, 393 P.3d 314), we do not directly review the prosecutor's actions, but that of the district court, *id.* Here, the prosecutor's potentially problematic statement was cut short by trial counsel's objection that the prosecutor had "broken his own stipulation." The district court sustained the objection and, out of the presence of the jury, the prosecutor agreed to limit his argument to the terms of the stipulation. Boyer has not challenged the district court's ruling or argued how the district court should have responded differently to the prosecutor's statements.

evidence would violate the defendant's "constitutional rights" to a fair trial. *See State v. Thornton*, 2017 UT 9, ¶ 74, 391 P.3d 1016 (cleaned up). Among those rights is the defendant's right to present a meaningful defense through "reasonable cross-examination." *State v. Marks*, 2011 UT App 262, ¶ 13, 262 P.3d 13 (cleaned up). But that right is "not without limitation" and may "bow to accommodate other legitimate interests in the criminal process," such as concerns about "harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant." *Clark*, 2009 UT App 252, ¶ 16 (cleaned up). Therefore, to admit evidence of an alleged victim's other sexual behavior, the defendant must meet the "high bar" of demonstrating that he has a "weighty interest that is significantly undermined by" the exclusion of such evidence and that exclusion under rule 412 is "arbitrary or disproportionate to the purposes [the rule] is designed to serve." *Thornton*, 2017 UT 9, ¶ 77 (cleaned up). In other words, the defendant must show that "the evidence in question is essential to the presentation of [his] defense." *Id.* ¶ 78.

¶31 Apart from this exception, our supreme court has also held that rule 412 poses no bar to a similar type of evidence—an alleged victim's prior false allegations of sexual abuse. "Evidence of false statements of unrelated sexual assaults are not excluded by the rape shield rule because they are not evidence of sexual conduct per se." *Tarrats*, 2005 UT 50, ¶ 24 (cleaned up). However, because "a truthful prior allegation of rape carries no value whatsoever in the trial process, and its admission into the evidence bears a high potential for humiliating the accuser, discouraging victims from reporting sexual crimes against them, and introducing irrelevant and collateral issues that may confuse or distract the jury," "any potential probative value . . . prior allegations of [sexual abuse] bear depends upon them being false." *Id.* "Thus, in order to ensure that such improper evidence is not admitted, a defendant who wishes to impeach his accuser's credibility with the accuser's prior allegation of [sexual

abuse] must first demonstrate by a preponderance of the evidence that the allegation was false." *Id.* ¶ 25. And even if the defendant is able to make this threshold showing, "[t]rial judges [retain] wide discretion in limiting the scope and extent of cross-examination and the admissibility of evidence to that end." *Id.*

¶32 Boyer contends that the office incident and the cousin incident are admissible as evidence necessary to the presentation of Boyer's defense, *see* Utah R. Evid. 412(b)(3), and that the office incident is admissible as a false allegation of sexual abuse.[5] But we conclude that Boyer has not shown that evidence of either the office or cousin incidents were admissible under either theory.

¶33 First, it is apparent from the record that the defense's primary theory was that the ex-wife had indoctrinated the victim to fabricate the allegations against Boyer and that the ex-wife was motivated to do so out of bitterness after her divorce from Boyer and the possibility that she might lose custody of her children. Boyer presented evidence at trial to support this theory. For example, trial counsel elicited testimony from the victim and the ex-wife that they had a very close relationship. The victim also testified that the ex-wife told her Boyer suffered from genital herpes and that is why she reported to the nurse practitioner that she suffered from herpes outbreaks. The ex-wife also testified that she ended her marriage to Boyer abruptly, rather than amicably, when she removed his belongings and locked him out of their family home. She also admitted that she had a drinking problem, for which she in part blamed Boyer. Boyer testified that one of his sons provided him with a

---

5. By extension, Boyer argues that he was prejudiced by the prosecutor's misrepresentation of the office incident at the rule 412 hearing and that trial counsel was deficient for failing to uncover that the office incident involved the other friend's father.

photograph of the ex-wife apparently passed out in the middle of the kitchen floor after taking a sleeping pill and possibly consuming alcohol. In addition, through the stipulation, trial counsel was able to argue that the victim was capable of fabricating allegations because she may have done so regarding the uncharged sleepover incident.

¶34　In light of the defense theory and supporting evidence that Boyer argued to the jury at trial, Boyer cannot meet the "high bar" to show that evidence of the victim's other allegations was essential to the presentation of his defense. *See Thornton*, 2017 UT 9, ¶ 77. Although Boyer argues that the State did not turn over the letter regarding the office incident to hide its "lack of confidence" in the victim and that evidence of that allegation in combination with the cousin incident evidence could have been used to challenge the psychiatrist's expert testimony, Boyer has not shown how accomplishing either of those goals was necessary to his defense. Boyer's primary theory was that the victim fabricated the allegations at the behest of the ex-wife, and he was allowed to present evidence to support his argument that the victim was inconsistent and dishonest and that the ex-wife had motive to indoctrinate the victim. Accordingly, the district court acted within its discretion in ruling that Boyer's "arguments about the evidence [of other allegations] are speculative" and that he "failed to show that evidence would be admissible under [an] exception to rule 412."

¶35　Second, Boyer cannot establish by a preponderance of the evidence that the victim's allegations regarding either the cousin incident or the office incident were false. *See Clark*, 2009 UT App 252, ¶ 22. To carry his burden, Boyer must show that it is "more likely than not" that the victim fabricated the other allegations. *See Kilgore Cos. v. Utah County Board of Adjustment*, 2019 UT App 20, ¶ 17, 438 P.3d 1025 (cleaned up). But Boyer has not pointed to any evidence he could have offered to refute the victim's accounts, particularly given that the other friend's father was unwilling to cooperate with Boyer's defense and the victim's

cousin died before Boyer's trial.[6] As a result, Boyer could not have carried his burden to prove that the victim's allegations were false.

¶36   Because Boyer has failed to show that evidence of the cousin incident and the office incident are admissible, he cannot show that trial counsel was ineffective for failing to investigate the letter and in stipulating to the introduction of only the sleepover incident or that the State withheld material exculpatory evidence in failing to turn over the letter. Trial counsel was in possession of the police reports detailing the office incident and could have reasonably believed that the information in the stipulation was more than what the district court would have otherwise admitted and that the other allegations were inadmissible and unnecessary to the defense. *See Strickland v. Washington*, 466 U.S. 668, 690–91 (1984) (stating that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" but that even "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation"). Similarly, even assuming failure to turn over the victim's letter detailing the office incident constitutes error, there is no reasonable likelihood that such an

---

6. The stipulation concerned the sleepover incident, not the office incident. But even assuming that Boyer could have secured a similar stipulation with respect to the office incident, the mere fact that no charges were filed would not establish, by a preponderance of the evidence, that the victim's allegations regarding the office incident were false. *See Hughes v. Raines*, 641 F.2d 790, 792 (9th Cir. 1981) (holding that a prosecutor's decision not to press charges does not establish that a prior accusation of sexual assault was false because that decision "could mean no more than that [the prosecutor] did not have sufficient evidence to obtain a conviction").

error had any effect on the outcome of the proceedings because the letter itself was inadmissible. *See Walker v. State*, 624 P.2d 687, 691 (Utah 1981) (reversing for the State's failure to disclose evidence favorable to the defense where there "exist[ed] a reasonable likelihood the false impression fostered by the prosecutor could have affected the judgment of the jury"). Accordingly, all of Boyer's claims relating to the evidence of the victim's other allegations of sexual abuse fail.

B.     The Psychiatrist's Expert Testimony

¶37     In November 2015, before Boyer's first trial, the State filed notice of an expert who would testify about "delayed disclosure in child sexual abuse cases and risks associated with being a victim of child sexual abuse." In response, trial counsel argued that the notice was insufficient and requested a continuance or, alternatively, that the psychiatrist's testimony be excluded. The district court granted trial counsel's motion to continue in order to give the defense time to investigate the psychiatrist's proposed testimony.

¶38     At trial the following year, the State elicited testimony from the psychiatrist that he was board certified in forensic psychiatry and child psychiatry since 1998, had published scholarly work pertaining to child trauma, was responsible for assessing and treating child victims of abuse for thirteen years, and had focused his practice on child abuse for thirty-six years. After presenting the psychiatrist's credentials, the prosecutor then began examining the psychiatrist "based on [the psychiatrist's] body of experience and training and knowledge" he had accumulated over his decades of practice. When the prosecutor asked whether, based on the psychiatrist's expertise, immediate disclosure or delayed disclosure of child sexual abuse was more common, trial counsel objected for lack of foundation. The district court allowed trial counsel to conduct voir dire, and after questioning the witness, trial counsel argued that the psychiatrist's testimony was based on data to which the defense

had not been given notice. Trial counsel conducted additional voir dire, and the psychiatrist testified that his testimony would primarily rely on his "history of work with victims and knowledge of child sexual abuse." The district court ruled that the psychiatrist's testimony did not rely on "specialized data," to which Boyer would be entitled to access pursuant to Utah Code section 77-17-13(2), but rather on the psychiatrist's thirty-year practice. Nevertheless, the court instructed the psychiatrist not to "specifically cite a study or anything else like that" in giving his testimony.

¶39    During direct examination, the psychiatrist testified that children who suffer sexual abuse have an "increased lifetime risk" of "a variety of conditions" including suicidality, substance abuse, and "later sexual problems," such as misperceiving a person's intentions from an innocent show of affection in the future. The psychiatrist also testified that delayed disclosure was common among child victims. The psychiatrist acknowledged that he had not "been briefed on the underlying facts and allegations related to [the State's] case," had no knowledge of the victim's mental health or medical history, and had never met with or treated the victim as a patient.

¶40    On appeal, Boyer argues that the psychiatrist's testimony lacked foundation and improperly bolstered the victim's allegations. As a result, Boyer argues, the district court erred in admitting the psychiatrist's testimony and trial counsel was ineffective for failing to file a motion in limine to exclude the testimony.[7] Because Boyer's claims of district court error and

---

7. In a single sentence, Boyer also appears to argue that the district court erred in admitting the psychiatrist's testimony because it was unhelpful to the jury. *See* Utah R. Evid. 702(a). To the extent that Boyer has even raised this as an issue for our review, it is inadequately briefed and we decline to reach it. *See State v. Green*, 2005 UT 9, ¶ 11, 108 P.3d 710 (explaining that an

(continued…)

ineffective assistance of counsel both depend upon whether the psychiatrist's testimony actually lacked foundation or impermissibly bolstered the victim's allegations against Boyer, we address those questions as a threshold matter.

¶41    A district court has discretion to admit or exclude expert testimony, and we will not conclude that a district court has erred in admitting such testimony absent an abuse of that discretion. *State v. Maestas*, 2012 UT 46, ¶ 154, 299 P.3d 892. A district court abuses its discretion when it admits evidence that does not meet a threshold showing of reliability. *Id.* ¶ 121. Under rule 702(a) of the Utah Rules of Evidence, a witness "who is qualified as an expert by knowledge, skill experience, training, or education may testify in the form of an opinion or otherwise" if the expert has "scientific, technical, or other specialized knowledge" that will help the jury "understand the evidence" or "determine a fact in issue." Rule 702(b) also requires the party offering the expert testimony to make a "threshold showing that the principles or methods that are underlying in the testimony (1) are reliable, (2) are based upon sufficient facts or data, and (3) have been reliably applied to the facts." "Under this rule, courts should generally exclude testimony if the testimony is within the knowledge or experience of the average individual" and must "always take care to ensure that the testimony does not transgress into the area reserved for the jury—including credibility assessments." *State v. Martin*, 2017 UT 63, ¶ 29, 423 P.3d 1254 (cleaned up).

¶42    Boyer first contends that the State did not make the threshold showing of reliability. In support of this contention, Boyer cites a law review article that suggests that one study

---

(…continued)

appellant's brief is inadequate when it provides only "one or two sentences stating his argument generally and then broadly conclude[s] that he [is] entitled to relief" (cleaned up)).

listed in the psychiatrist's curriculum vitae cannot be relied upon to discern common traits among child sexual abuse victims. But even accepting the premise of that law review article as true, Boyer ignores that the psychiatrist did not testify based on the scholarly work listed in his curriculum vitae. In fact, the district court prohibited the psychiatrist from doing so in its instruction after voir dire. Rather, the psychiatrist testified based on his thirty years of experience working with child abuse victims, for which the State laid ample foundation, and Boyer has not challenged the psychiatrist's training and experience as a child abuse psychiatrist. Boyer has not made any effort to explain how the psychiatrist's extensive training and practical experience were inadequate to support his testimony of "specialized knowledge" about the behaviors and symptoms consistent with child sexual abuse victims. Accordingly, Boyer has not demonstrated that the district court abused its discretion in making its threshold reliability determination, *see State v. Roberts*, 2015 UT 24, ¶ 56, 345 P.3d 1226 (rejecting challenge to the admission of expert testimony where defendant pointed to no record evidence or supporting authority to refute the court's reliability determination), or that trial counsel performed deficiently in failing to file a motion objecting to the psychiatrist's testimony based on lack of foundation.

¶43  Boyer also contends that trial counsel performed deficiently in failing to object to the admission of the psychiatrist's testimony as impermissibly bolstering the victim's allegations or, alternatively, if the objection was preserved, that the district court erred in allowing such testimony. Specifically, Boyer contends that the psychiatrist's "behavioral theory invited jurors to infer that [the victim's] behavioral history circumstantially proved her claims true."

¶44  "While experts may use their expertise to help the factfinder understand issues at trial, experts cannot testify that a particular witness has or has not told the truth." *State v. Burnett*,

2018 UT App 80, ¶ 25, 427 P.3d 288. Rule 608(a) of the Utah Rules of Evidence "prohibits any testimony as to a witness's truthfulness on a particular occasion." *State v. Rimmasch*, 775 P.2d 388, 391 (Utah 1989), *superseded in part by rule as stated in State v. Maestas*, 2012 UT 46, 299 P.3d 892. Applying rule 608(a), our supreme court has held that "an expert may not express an opinion as to a child's truthfulness with respect to statements of child sex abuse." *State v. Ramsey*, 782 P.2d 480, 485 (Utah 1989). Expert testimony that a victim's behavior matches a psychological profile for victims of sexual abuse is likewise impermissible. *Rimmasch*, 775 P.2d at 402 n.13.

¶45 On the other hand, evidence of "the manifestation of certain behavioral symptoms may have some probative value as circumstantial evidence," and "[e]xpert testimony that such symptoms are consistent with sexual abuse, subject to appropriate limitations and instructions to the jury, may enable the jury to assess the probative relevance of the evidence in light of all other evidence." *State v. Kallin*, 877 P.2d 138, 141 (Utah 1994). Such testimony "does not amount to inadmissible profiling evidence, because [it] does not prove directly the ultimate legal conclusion that a particular victim has been abused" and therefore does not improperly invade "the province of the jury as factfinder." *Burnett*, 2018 UT App 80, ¶ 27 (cleaned up).

¶46 Here, the psychiatrist's testimony does not constitute inadmissible profiling evidence or improper bolstering of the victim's credibility. The psychiatrist testified about "mental health problems, physical problems, [and] behavioral problems" that are common among child sexual abuse victims. He also explained that such "problems" among victims can occur "down the road" from the abuse and that there are a "large number" of possible psychological effects of sexual abuse for child victims, including that victims of child sexual abuse can be "more vulnerable to misperceiving" innocent shows of affection, commonly delay disclosing the

abuse, and can tend to communicate "some level of inconsistency" in their disclosures depending on their circumstances.

¶47 Importantly, the psychiatrist did not testify about how "to discern truthful sexual abuse allegations from false ones" and did not testify about how often children make false allegations. *See id.* ¶ 36 (holding that the psychiatrist expert's testimony about how often and under what circumstances children fabricate sexual abuse allegations was impermissible bolstering because the "prosecution was clearly inviting the jury to draw inferences about [the victim's] credibility based upon [the expert's] past experience" (cleaned up)). The psychiatrist also did not speak "in terms of probabilities" or "offer direct opinions on the truthfulness" of the victim's allegations. *See State v. King*, 2010 UT App 396, ¶ 45, 248 P.3d 984 (cleaned up) (holding that testimony from a police officer and a social worker that they were not "inclined to pursue all claims that came before them" was not impermissible bolstering). And while the psychiatrist did testify that delayed and inconsistent disclosure was common among child sexual abuse victims in his professional practice, he did not "seek to connect [his] testimony about the general behavioral characteristics of child victims of sexual abuse to" the victim's specific conduct. *See Martin*, 2017 UT 63, ¶¶ 10, 33 (holding that expert testimony from a CJC forensic interviewer "regarding common behaviors" of child sexual abuse victims and why victims "often make incomplete disclosures and disclose additional details and facts pertaining to their sexual abuse over time" was not impermissible bolstering). Indeed, the psychiatrist did not address or opine, even hypothetically, whether the evidence presented regarding the victim and any physical or mental problems she may have suffered was indicative of abuse and confirmed that he had never met the victim and was not aware of any facts pertaining to her life or the allegations against Boyer.

¶48 Ultimately, the psychiatrist's testimony here is distinguishable from the type of bolstering testimony our courts have held to be impermissible. *See generally, e.g., State v. Rammel*, 721 P.2d 498 (Utah 1986); *Burnett*, 2018 UT App 80; *State v. Iorg*, 801 P.2d 938 (Utah Ct. App. 1990). As a result, trial counsel did not render deficient performance by not raising a bolstering objection, and the district court did not plainly err by not excluding the testimony sua sponte.

C.      The Victim's Medical and Mental Health Records

¶49    In May 2015, the State learned from the victim's aunt that the victim had been admitted to the hospital after discussing and apparently attempting suicide because "it didn't seem like anybody was listening or caring, . . . [and Boyer's trial] was just never going to come around and [the victim] was tired of worrying about it." According to the victim's aunt, the victim had been diagnosed with PTSD and attachment disorder while she was being treated in the hospital. After learning of the victim's hospitalization, the State disclosed the information it had received to trial counsel. Rather than litigate the issue, the State and trial counsel stipulated to the district court's in camera review of the victim's hospitalization records for relevant exculpatory information. The district court reviewed the records in camera and determined that they contained no information of exculpatory value. Without objection from the State and trial counsel, the district court shredded the records.

¶50    At trial, after hearing testimony from the victim about how her feelings that she "didn't want to live any more" were in some "way connected to the things" the victim testified to regarding Boyer, trial counsel made another motion to produce the medical and mental health records the district court reviewed in camera, arguing that the victim's testimony revealed that the records contained exculpatory evidence. The district

court reiterated that there "was nothing exculpatory in those records at all" and denied trial counsel's motion.[8]

¶51 After Boyer was convicted, appellate counsel filed a motion to re-subpoena the records the district court had already reviewed as well as the last ten years of the victim's school counseling records. The district court denied Boyer's motion as to all of the victim's records, specifically determining that Boyer had "failed to show in post-trial proceedings that he is entitled to have the [district court] issue subpoenas" for the victim's medical and mental health records.

¶52 On appeal, Boyer argues that his trial counsel provided ineffective assistance for failing to request subpoenas for additional medical and mental health records before trial, for failing to consult with experts regarding the probative value of the victim's records, for failing to object to the district court shredding the victim's records after in camera review, and for failing to provide memoranda to guide the court's in camera review.[9] He also claims that the district court erred in

---

8. The parties specifically stipulated that the district court would review the victim's records in camera and provide "both parties with any materials that contain relevant inculpatory or exculpatory information." However, under rule 506 of the Utah Rules of Evidence and our case law, neither Boyer nor the State was entitled to the production of the privileged information contained in the records unless the district court found that the records contained materially exculpatory evidence or the victim had waived the privilege. *See State v. Blake*, 2002 UT 113, ¶ 23, 63 P.3d 56.

9. Boyer also argues that trial counsel was ineffective for failing to request the victim's school records from every school the victim had attended for the preceding ten years, all of the

(continued…)

denying his post-verdict motions to subpoena the victim's records.

¶53　Even with the benefit of new counsel and additional post-verdict investigation, Boyer cannot establish that he was entitled to an in camera review of the victim's medical and mental health records below, let alone that he was entitled to the production of those records. As a result, the district court did not err in denying his post-verdict motions and his trial counsel did not render ineffective assistance by forgoing further efforts to obtain records to which Boyer was not entitled.

---

(…continued)

victim's DCFS records, and the victim's cell phone records from the day and time of the victim's first CJC interview. He also argues that the district court erred in denying appellate counsel's motion to subpoena those records. The district court summarily denied Boyer's post-trial motion for subpoenas, and the State contends that rule 14(b) of the Utah Rules of Criminal Procedure, which sets forth the procedure for subpoenaing victim records in a criminal case, does not entitle defendants to subpoena records post-trial. *See* Utah R. Crim. P. 14(b)(3) (stating that a request for the production of victim records "shall be filed with the court as soon as practicable, but no later than 28 days before trial, or by such other time as permitted by the court"). Even assuming that defendants are entitled to subpoena victim records post-trial, Boyer has failed to point to any authority or facts in the record to support his contention that he is entitled to the subpoenas under Utah and federal law. *See id.* R. 14(b)(1) ("No subpoena . . . compelling the production of medical, mental health, school, or other non-public records pertaining to a victim shall be issued by or at the request of the defendant unless the court finds . . . that the defendant is entitled to production of the records . . . under applicable state and federal law.").

¶54    Under rule 506(b) of the Utah Rules of Evidence, patients have a presumptive "privilege . . . to refuse to disclose and to prevent any other person from disclosing information that is communicated in confidence to a physician or mental health therapist for the purpose of diagnosing or treating the patient." "Although this privilege is an important one, the rule provides exceptions in certain circumstances, one of which [Boyer] suggests is applicable here." *See State v. Blake*, 2002 UT 113, ¶ 18, 63 P.3d 56, 61; *see also* Utah R. Evid. 506(d)(1)–(3). Specifically, Boyer argues that the exception contained in rule 506(d)(1) applies to this case.[10]

¶55    Rule 506(d)(1) provides, in relevant part, that no privilege exists for "communications relevant to an issue of the physical, mental, or emotional condition of the patient . . . in any proceeding in which that condition is an element of any claim or defense." Utah R. Evid. 506(d)(1)(a). This exception requires the party seeking production of records to demonstrate: (1) "the patient suffers from a physical, mental, or emotional *condition* as opposed to mental or emotional problems that do not rise to the level of a condition," (2) "the patient's condition is an element of any claim or defense" at issue, and (3) "the defendant has shown with reasonable certainty that the . . . records will contain

10. Boyer also argues that the victim waived the privilege by testifying at trial about the hospitalization. The victim's testimony was limited to describing the "emotional troubles" and suicidal ideation that led to her hospitalization and confirming, in response to the prosecutor's question, that those problems were "connected to the things" she had testified about regarding Boyer. Because the victim did not disclose her privileged communications with her treatment providers, she did not waive the privilege. *See* Utah R. Evid. 510(a) (providing, in part, that a privilege is waived when the person holding the privilege "voluntarily discloses or consents to the disclosure of any significant part of the matter or communication").

exculpatory evidence to the defense." *State v. J.A.L.*, 2011 UT 27, ¶ 48, 262 P.3d 1 (cleaned up).

¶56    Boyer argues that the victim's reported diagnoses of attachment disorder and PTSD satisfies the requirement that the victim suffered from "a physical, mental, or emotional condition." For purposes of the rule, "[a] mental or an emotional condition is a state that persists over time and significantly affects a person's perceptions, behavior, or decision making in a way that is relevant to the reliability of the person's testimony." *State v. Worthen*, 2009 UT 79, ¶ 21, 222 P.3d 1144. In an attempt to meet this standard, Boyer relies on the affidavits of two doctors, whose opinions appellate counsel secured post-trial, who state that children who suffer from attachment disorder "will do whatever it takes to obtain their wants and needs including lying, being aggressive, stealing, or . . . engag[ing] in self-harm." Boyer claims that "the attachment disorder diagnosis would have illuminated [the victim's] bond with [the ex-wife], or Mom, as she called her (until she moved in with her aunt and started calling her Mom), and also suggested that [the victim] may have been prone to lie." (Cleaned up). Boyer also suggests that the victim's "PTSD, suicidality and depression, medically may have undermined her cognitive functioning and ability to testify reliably—and 'might lead to uncertainty' regarding her trustworthiness, satisfying the third prong of [rule] 506(d)(1)." (Cleaned up).

¶57    For purposes of this appeal, we assume, without deciding, that the victim's attachment disorder qualifies as a chronic and persistent "condition" under the rule and we accept as true the defense expert's declarations that such a condition is relevant to the reliability of the victim's testimony. But even assuming that, with the benefit of the additional investigation and briefing, trial counsel could have established the first two requirements of rule 506(d)(1)(a), Boyer still cannot establish with reasonable certainty that the sought-after records contain exculpatory evidence. Reasonable certainty "lies on the more stringent side of

'more likely than not.'" *Blake*, 2002 UT 113, ¶ 20. "This is a stringent test, necessarily requiring some type of extrinsic indication that the evidence within the records exists and will, in fact, be exculpatory." *Id.* ¶ 19. "The difficulty in meeting this test is deliberate and prudent in light of the sensitivity of these types of records and the worsening of under-reporting problems in the absence of a strong privilege." *Id.*

¶58 Even with the benefit of the additional post-trial investigation and briefing conducted by appellate counsel, Boyer has not met this stringent test. Boyer has offered no basis to conclude that the victim's school counseling records contain any information regarding the conditions Boyer claims are relevant to his defense. As to the 2014 and 2015 hospital records, Boyer claims that the "aunt's interview revealing the diagnoses and [a post-trial expert's] declaration about what the records would be expected to contain were extrinsic evidence of what the records contained." (Cleaned up). At most, Boyer has established a reasonable certainty that those records would contain diagnoses that, according to the defense's post-trial experts, could have adversely affected the reliability of the victim's testimony. But the State disclosed those diagnoses before trial, and Boyer does not explain why trial counsel's failure to secure the victim's records prevented him from presenting that defense.

¶59 The only other "extrinsic evidence" Boyer relies on is the victim's testimony that "this case was only part of the reason" she was hospitalized. Based on that testimony, Boyer speculates that the records "should indicate causes other than Boyer for [the victim's] depression, suicidality and PTSD," such as "other perpetrators, the victim's family difficulties, or other causes for treatment." (Citations omitted.) Not only is this argument speculative, it is untethered from the rest of the rule 506(d)(1) analysis. Boyer can arguably satisfy the first two prongs of the exception only because he has offered some evidence that the victim's attachment disorder was a "condition" that may have a bearing on her ability to testify truthfully. But

he has not established either that these "other causes" for the victim's treatment rise to the level of a condition for purposes of the rule or that any such condition affected the victim's testimony.

¶60  Put simply, Boyer cannot show that he would have been entitled to in camera review of the victim's mental health records even if trial counsel had done all that appellate counsel has in pursuit of the records. Far from rendering deficient performance, trial counsel secured a stipulation allowing an in camera review of the victim's hospitalization records, which was more than Boyer was entitled to. Because Boyer had no right to such a review, we further conclude that the district court properly denied Boyer's post-trial motion to subpoena the records.

D.     Remaining Claims of Ineffective Assistance of Counsel

¶61  In addition to the ineffective assistance of counsel claims addressed above, Boyer has identified several additional instances in which he claims that his trial counsel rendered ineffective assistance. Unlike the ineffective assistance claims we have already addressed, these remaining claims do not turn on our resolution of separate legal issues. Instead, they turn on the constitutional standard for demonstrating denial of the defendant's Sixth Amendment right to counsel.

¶62  To show that trial counsel provided ineffective assistance, Boyer has the burden of establishing first that trial "counsel's performance was deficient" in that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The purpose of the right to counsel is "to ensure that criminal defendants receive a fair trial" and not "to improve the quality of legal representation." *Id.* at 689. As a result, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. Because "it

is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence," "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (cleaned up). We emphasize that "there are countless ways to provide effective assistance in any given case" and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.*

¶63　In this case, Boyer recites a long list of instances where he believes that trial counsel performed deficiently in investigating and presenting Boyer's defense at trial. We "need not analyze and address in writing each and every argument, issue, or claim raised and properly before us on appeal." *State v. Jones*, 783 P.2d 560, 565 (Utah Ct. App. 1989) (cleaned up). Although we do not recite each of Boyer's ineffective assistance claims, Boyer generally claims that trial counsel performed in an objectively deficient manner by:

- not retaining an expert to review the victim's first CJC interview;

- not retaining an expert to evaluate the nurse practitioner's opinion;

- not cross-examining the ex-wife at Boyer's second trial about her inconsistent descriptions of how the victim initially disclosed Boyer's abuse;

- not further impeaching the victim with testimony from Boyer's first trial;

- not moving to strike all of the ex-wife's testimony after objecting to the ex-wife's bolstering statement and the court sustained the objection;

- using the photographs of Boyer's genitals to argue that the victim's descriptions were inaccurate, rather than moving to exclude the photographs or conduct additional cross-examination of the detective and the victim; and

- not cross-examining the victim about her prior testimony that the ex-wife was always home during Boyer's abuse.

¶64 After fully reviewing each of the claims raised on appeal, we conclude that Boyer has not carried his burden of demonstrating that he was deprived of effective assistance of counsel. In support of his claims, Boyer makes little more than bare assertions that trial counsel's decisions were objectively unreasonable and therefore deficient. He has not explained why trial counsel's alleged "acts or omissions" could not "have been the result of reasonable professional judgment," nor has he explained how these alleged errors impeded his ability to receive a fair trial. *See Strickland*, 466 U.S. at 690. Furthermore, Boyer has pointed us to no authority that would overcome our presumption that trial counsel's investigation of and opposition to the State's evidence was reasonable in the context of the defense's trial strategy.

¶65 Constitutionally ineffective assistance occurs when counsel makes errors "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* 687. Simply identifying arguably better choices that trial counsel could have made does not establish that trial counsel erred, let alone that those alleged errors were "so serious" that Boyer was deprived of his constitutional right to counsel. Just as due process guarantees a fair trial, but not a perfect one, *see Lutwak v. United States*, 344 U.S. 604, 619 (1953), the right to counsel guarantees a competent attorney, not one whose performance is impervious to critique. An ineffective

assistance of counsel claim is not an invitation to flyspeck the record and, with the luxury of time and the benefit of hindsight, identify ways in which counsel might have been even more effective. In denying Boyer's motion for a new trial, the district court observed that Boyer was "well-represented at trial and throughout the litigation." Our review of the record confirms this assessment. Accordingly, we reject Boyer's remaining ineffective assistance of counsel claims.

E.      Cumulative Error

¶66     Boyer has not shown any error in his trial proceedings. Because the cumulative error doctrine does not apply "if the claims are found on appeal to not constitute error, or the errors are found to be so minor as to result in no harm," the district court did not err in denying Boyer's motion for a new trial. *See State v. Maestas*, 2012 UT 46, ¶ 363, 299 P.3d 892 (cleaned up).

II. Motion to Disqualify the Trial Judge

¶67     At sentencing, after hearing from the victim and her aunt, the trial judge addressed the victim:

> You had to do some things that were very, very unpleasant. You had to undergo maybe one of the best defense lawyers in the state. You had to embarrass yourself in front of a large group of strangers by telling them intimate details that you shouldn't have to be forced to share with anyone. You had to be poked and prodded by doctors that you had never seen before, and it just kept going on and on and on.
>
> Any minute you could have said, "You know what, it's not worth it. I'm not putting myself out there anymore," but you chose not to. I have to tell

you, I wish we had more people like you, quite frankly. I wish there were more heroes in this world, but you're definitely one of them.

The other thing I'll tell you is that this person may have pushed you back a little bit in life in terms of what's going on, but he didn't conquer you, and he certainly didn't stomp you out, and you're going to come back twice as good now, knowing that this man will never, ever get out of prison. You'll never even have to look backwards. I hope you understand that, and I hope that gives you some comfort.

I know there's no way I can undo the harms that this man did to you. There's nothing I can do today. I wish there were. I—there isn't. The one thing I can do, though, is this little piece of the puzzle here, that is having him out and you having to never think about him again, that's all going to end today, all right? I want you to understand that, and understand that you have my absolute respect and admiration for what you did.

¶68    The trial judge also addressed Boyer:

I have to be honest with you, I completely think—I watched [the victim] testify on two separate occasions, given the fact that we had to try this case twice, and I believe every word that she said, as did the jury. I think everything she said was right on point. Everything she said had the detail and so forth that that is not a story that could have been fed to her, and certainly her life the way that's worked out shows that. I believe everything she told me. . . .

> Part of the problem here is I don't even think that you have the character or the guts to even come forward and admit to what you've done to this poor person, and that's horribly unfortunate, more to you than anything. The reality is that she— you're not a problem she's ever going to have to think about again. Good luck to you, sir.

¶69 Boyer argues that these comments required disqualification from subsequent post-trial motion hearings because they demonstrated that the trial judge was actually or apparently biased.[11] Specifically, Boyer claims that the court's statements criticizing Boyer's character and expressing a belief in the victim's testimony, admiration for her bravery, and the hope that she would take some comfort in the sentence imposed,

---

11. Boyer also argues that the trial court violated rule 2.10(B) of the Utah Code of Judicial Conduct, which provides that judges "shall not, in connection with cases, controversies, or issues that are likely to come before the court, make pledges, promises, or commitments that are inconsistent with the impartial performance of the adjudicative duties of judicial office," thus warranting recusal. Specifically, Boyer contends that the judge's statements to the victim constituted a "pledge that the victim would not have to look back or think about Boyer" and made it impossible for the judge to fairly decide post-trial motions. But "[s]uch an [argument] incorrectly equates judicial conduct that would violate a criminal defendant's constitutional rights with judicial conduct that might lead to sanctions for a judge." *See State v. Munguia*, 2011 UT 5, ¶ 16, 253 P.3d 1082. "The parameters of defendants' constitutional rights to a fair trial are defined by [rule 29 of the Utah Rules of Criminal Procedure] and relevant case law, *not* the Code of Judicial Conduct." *State v. Neeley*, 748 P.2d 1091, 1094 (Utah 1988). Thus, we consider the judge's comments to the victim only to the extent that they demonstrate any actual or apparent bias.

established favoritism toward the victim and antagonism toward Boyer and thus required disqualification.

¶70    "The parameters of defendants' constitutional rights to a fair trial are defined by [rule 29 of the Utah Rules of Criminal Procedure] and relevant case law . . . ." *State v. Neeley*, 748 P.2d 1091, 1094 (Utah 1988). Rule 29 dictates the procedure a judge must follow when confronted with a motion to disqualify: "The judge against whom the motion and affidavit are directed shall, without further hearing, enter an order granting the motion or certifying the motion and affidavit to a reviewing judge." Utah R. Crim. P. 29(b)(2)(A). The rule "present[s] the trial judge with a binary choice: recuse him- or herself, or if he or she questions the legal sufficiency of the affidavit, certify the matter to another named judge for a ruling on its legal sufficiency." *State v. Gavette*, 2019 UT App 73, ¶ 8, 442 P.3d 1243 (cleaned up); *see also* Utah R. Crim. P. 29(b)(2)(A).

¶71    In this case, Boyer filed a motion to disqualify the trial judge shortly after Boyer's sentencing hearing. The trial judge declined to grant the motion, and instead certified it to the associate presiding judge, who reviewed and ultimately denied the motion. Because the trial judge followed the procedures set forth in rule 29, Boyer "bears the heightened burden of demonstrating either actual bias or abuse of discretion."[12] *See State v. Asta*, 2018 UT App 220, ¶ 20, 437 P.3d 664 (cleaned up).

---

12. Boyer does not argue that the reviewing judge abused his discretion in denying the motion for disqualification. Rather, he argues that the trial judge "abused and exceeded his discretion" in making the challenged comments at sentencing. This is not the relevant inquiry. *See State v. Asta*, 2018 UT App 220, ¶ 20, 437 P.3d 664 (concluding that a movant bears a heightened burden of demonstrating either that the sentencing judge was actually biased or that the reviewing judge abused discretion in denying motion).

Alternatively, "a trial judge's failure to recuse based on the appearance of bias may be grounds for reversal if actual prejudice is shown." *State v. Alonzo*, 973 P.2d 975, 979 (Utah 1998). Because Boyer has not established either actual bias or an appearance of bias and prejudice, he is not entitled to a new trial.

A.    Actual Bias

¶72    "Due process guarantees an absence of actual bias on the part of a judge." *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905 (2016) (cleaned up). Because "bias is easy to attribute to others and difficult to discern in oneself," governing case law "asks not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias." *Id.* (cleaned up). Thus, the Due Process Clause requires recusal when a judge has "a direct, personal, substantial, pecuniary interest" in a case and in other instances where, objectively, "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876, 877 (2009) (cleaned up). Accordingly, rule 2.11(A) of the Utah Code of Judicial Conduct contemplates disqualification where, for example, "the judge has a strong personal bias or prejudice concerning a party," has prior evidentiary knowledge of the case, "or has a financial or property interest that could be affected by the outcome of the proceeding." *State v. Munguia*, 2011 UT 5, ¶ 17, 253 P.3d 1082 (cleaned up); *accord* Utah Code Jud. Conduct 2.11(A).

¶73    On the other hand, "[t]he fact that a judge has formed an opinion regarding a particular defendant based on proceedings occurring in front of the judge is not a ground for disqualification listed in [the Utah Code of Judicial Conduct]." *State v. Kucharski*, 2012 UT App 50, ¶ 4, 272 P.3d 791. This is true because "bias and prejudice are only improper when they are

personal." *Munguia*, 2011 UT 5, ¶ 17 (cleaned up). "Neither bias nor prejudice refers to the attitude that a judge may hold about the subject matter of a lawsuit." *Id.* (cleaned up). Consequently, to require recusal, "the bias or prejudice must usually stem from an extrajudicial source, not from occurrences in the proceedings before the judge." *Id.* (cleaned up). "'Judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge,'" *Kucharski*, 2012 UT App 50, ¶ 5 (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)), as long as the judge "decide[s] the case only after all the evidence is heard" and "does not allow the propensities to obscure the evidence," *Madsen v. Prudential Fed. Sav. & Loan Ass'n*, 767 P.2d 538, 546 (Utah 1988) (cleaned up).

¶74 In a similar case, our supreme court held that the judge's remarks at sentencing did not violate the defendant's due process rights to an impartial judge. *Munguia*, 2011 UT 5, ¶¶ 19–20. The defendant, who pled guilty to multiple counts of sexual abuse of a child, argued that the sentencing judge displayed "hostility and ill will" by "(1) challenging [the defendant] about whether he understood who was at fault for the abuse; (2) twice asking [the defendant] if he still thought it was a good experience for his daughter to masturbate and fellate him; (3) commenting that [the defendant] had 'ruined' an innocent child; (4) stating that [the defendant's] daughter now had 'almost zero chance of having a stable marriage'; and (5) 'opining' that [the defendant] had 'destroyed' his daughter, who trusted him." *Id.* ¶ 18. The court concluded that the defendant had not established that the judge's ill will and anger toward the defendant were "motivated by an extrajudicial source or anything other than [the defendant's] own actions" in the case. *Id.* ¶ 19. Rather, there was "more than enough information in the record to indicate that any bias against [the defendant] stemmed from occurrences in the proceedings before the judge," including statements that the judge read from the pre-sentencing report and heard from the prosecutor at sentencing. *Id.* (cleaned up).

¶75 Similarly, in this case, the trial judge's comments were based on the evidence presented at trial, not gleaned from an improper source. The trial judge's assessment of the victim's credibility was based, not on prior knowledge or outside association, but on observing her testify at trial and her behavior and demeanor in open court. Similarly, his assessment of the defendant was not based on extrajudicial knowledge about Boyer but on the evidence presented at trial and sentencing. And the judge's remarks about the defendant "probably never" getting out of prison presumably referred to the sentence the court imposed, requiring Boyer's two fifteen-year-to-life sentences to run consecutively.

¶76 Boyer has pointed us to nothing in the record that shows "that [the trial judge's] anger was motivated by an extrajudicial source or anything other than [Boyer's] own actions in this case." *See id.* While we expect that judges "be patient, dignified, and courteous" to those with whom the judge deals in an official capacity, "that does not mean that due process or our Code of Judicial Conduct are violated whenever a defendant's criminal conduct and subsequent excuses inspire anger in a judge." *Id.* ¶ 20 (cleaned up). Nor should we require judges to refrain from offering words of encouragement or comfort to a crime victim at sentencing. The trial judge's comments in this case fall well short of "reveal[ing] such a high degree of favoritism or antagonism as to make fair judgment impossible." *See Liteky*, 510 U.S. at 555. Therefore, Boyer has not established actual bias.

B.    Appearance of Bias Resulting in Actual Prejudice

¶77 Boyer also argues that the trial judge's comments at sentencing created an appearance of bias. When, as in this case, the trial judge follows the procedures set forth in rule 29, a defendant must ordinarily establish actual bias on the part of the trial judge or an abuse of discretion on the part of the reviewing judge. However, our supreme court has recognized that "a trial judge's failure to recuse based on the appearance of bias may be

grounds for reversal if actual prejudice is shown." *Alonzo*, 973 P.2d at 979 (citing *State v. Gardner*, 789 P.2d 273, 278 (Utah 1989)); *see also* Utah R. Crim. P. 30(a). Here, we need not examine whether Boyer was prejudiced because he has not established an appearance of bias.

¶78 A judge should recuse him- or herself for appearance of bias when the judge's impartiality might reasonably be questioned. *Alonzo*, 973 P.2d at 979; *see also* Utah Code Jud. Conduct R. 2.11(A). "The question of a judge's impartiality is determined by viewing the question through the eyes of a reasonable person, knowing all the circumstances." *Asta*, 2018 UT App 220, ¶ 18 (cleaned up).

¶79 Utah courts have addressed only one instance where a judge's comments during trial created an appearance of bias. *See State v. Alonzo*, 932 P.2d 606, 611 (Utah Ct. App. 1997), *aff'd*, 973 P.2d 975 (Utah 1998). In *Alonzo*, the trial judge allegedly stated prior to trial, in chambers, and with both parties present, that the defendants' case "could be resolved quickly if they would waive their right to a jury trial and 'just plead guilty,'" and allegedly "suggested that he knew, based on his experience as a prosecutor, that [defendants] were guilty." *Alonzo*, 973 P.2d at 979. The State argued that the comments were made in jest, but this court and our supreme court found the question of sincerity immaterial because the comments "created an appearance of bias" in that they "suggested [the judge] had formed an opinion as to defendants' guilt even before the trial began," *Alonzo*, 932 P.2d at 611, which would "call into serious question the impartiality of any judge," *Alonzo*, 973 P.2d at 979.

¶80 In contrast, the trial judge's comments here do not create an appearance of bias. The "reasonable person" listening to the judge's statements and "knowing all the circumstances," *see Asta*, 2018 UT App 220, ¶ 18 (cleaned up), would not believe that the trial judge had prejudged Boyer's post-trial motions. At the

time of the sentencing hearing, Boyer had not yet filed any post-trial motions, and the trial judge's comments did not suggest that the judge had formed an opinion as to the merits of any future motions or proceedings.

¶81 To the contrary, the only opinions expressed by the judge related to the sentencing proceeding at hand. *Cf. State v. Lane*, 2019 UT App 86, ¶ 33, 444 P.3d 553 (holding, in the context of an ineffective assistance of counsel claim, that the court's finding that the defendant was "a danger to society" for purposes of determining his pretrial release status was not grounds for a disqualification motion). At sentencing, the judge is charged with considering all of the aggravating and mitigating circumstances surrounding the offense. *See State v. Wood*, 2018 UT App 98, ¶ 12, 427 P.3d 452. For instance, determining whether to impose concurrent or consecutive sentences requires judges to consider "the gravity and circumstances of the offenses, the number of victims, and the history, character, and rehabilitative needs of the defendant," *see* Utah Code Ann. § 76-3-401 (LexisNexis Supp. 2019), and "the granting or withholding of probation involves considering intangibles of character, personality and attitude," *see State v. Cline*, 2017 UT App 50, ¶ 7, 397 P.3d 652 (cleaned up). Moreover, crime victims have the right, enshrined in the Utah Constitution, to address the court at sentencing and "[t]o have a sentencing judge, for the purpose of imposing an appropriate sentence, receive and consider, without evidentiary limitation, reliable information concerning the background, character, and conduct of a person convicted of an offense." Utah Const. art. I, § 28.

¶82 Accordingly, a sentencing judge cannot—and should not—avoid addressing aggravating and mitigating circumstances on the record, a duty which may well include observations about the character of the defendant, the gravity of the offense, and the impact on the victim. Requiring a trial judge to recuse from hearing post-trial motions based on such statements would require frequent reassignment of those

motions to a new judge with no familiarity with the facts of the case and no firsthand knowledge of the proceedings on which the motions are based. Such a requirement would exact too high a price in terms of judicial efficiency, public confidence, and prompt disposition of criminal cases.

¶83    Because Boyer has not demonstrated that a reasonable person, knowing all the circumstances, would question the judge's ability to impartially preside over post-trial proceedings, it is not necessary to consider Boyer's argument that the district court's rulings related to restitution demonstrate actual prejudice.[13]

### III. Motion to Reconstruct the Record

¶84    Finally, Boyer argues that the district court erred in denying his motion to reconstruct the district court record with the victim's medical and mental health records, which the district court reviewed in camera. Boyer contends that it is impossible for us to review the district court's determination that the records did not contain any materially exculpatory information, and we agree. *See State v. Cramer*, 2002 UT 9, ¶ 25, 44 P.3d 690 ("We are unable to review [the district court's] ruling regarding materiality . . . because the medical records were not included in the appellate record."). However, in this case, we concluded that Boyer cannot show he was entitled to in camera review of the victim's records under rule 506(d)(1). *Supra* ¶¶ 53-60. As a result, Boyer cannot show that he was prejudiced by the absence of the victim's medical and mental health history from

---

13. Contrary to Boyer's assertion in his reply brief, the court's restitution rulings were not asserted as an independent basis for reversal in the opening brief, as they were raised solely in the context of establishing actual prejudice from the court's failure to recuse. We do not consider issues raised for the first time in reply briefs. *See Allen v. Friel*, 2008 UT 56, ¶ 8, 194 P.3d 903.

the record on appeal.[14] *See State v. DeJesus*, 2017 UT 22, ¶ 19, 395 P.3d 111 (holding that a defendant must show prejudice in order to obtain a reversal of his conviction based on the State's destruction of evidence in violation of his due process rights).

## CONCLUSION

¶85   The district court did not err in denying Boyer's motion for a new trial based on cumulative error. In addition, because the district court was neither actually nor apparently biased against Boyer, the reviewing judge properly denied Boyer's motion to disqualify. Finally, Boyer was not prejudiced by the absence of the victim's medical and mental health history from the record on appeal because he was not entitled to an in camera review of those records in the first instance. Accordingly, Boyer's convictions are affirmed.

_____

14. Similarly, Boyer cannot show that he was prejudiced by his trial counsel's failure to object to the court's shredding of the records after in camera review, even assuming that counsel's failure to object was error.