2022 UT App 35

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JOSHUA VANCE DEVER,
Appellant.

Opinion
No. 20200143-CA
Filed March 17, 2022

Third District Court, Salt Lake Department
The Honorable Paul B. Parker
No. 171901823

Nathalie S. Skibine and Michael D. Misner, Attorneys
for Appellant

Sean D. Reyes and John J. Nielsen, Attorneys
for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES DAVID N. MORTENSEN and JILL M. POHLMAN
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1 Following a jury trial, Joshua Vance Dever was convicted of sodomy upon a child for sexually abusing his ex-girlfriend's daughter, Faith.[1] Dever now appeals, arguing, among other things, that the district court erred in denying his motion for a directed verdict and in instructing the jury. While we conclude the court did not err in denying Dever's motion for a directed verdict, we agree with Dever that the court's jury instruction

---

1. A pseudonym.

was erroneous. Accordingly, we reverse and remand for a new trial.

BACKGROUND[2]

¶2 Dever began dating Faith's mother (Mother) when Faith was around eighteen months old. The couple dated for approximately four years and had a child together (Sister). During their relationship, the couple lived together along with Faith, Sister, and Dever's older daughter from a previous relationship (Stepsister). Before the couple separated, Faith and Dever had a "really good" relationship; Faith called Dever "dad" and "[s]he loved him."

¶3 The couple separated in the fall of 2014. However, Dever continued to care for both Faith and Sister, and he "continued to be a father figure" to Faith. Although there was no set visitation schedule, it was typical for the girls to visit Dever "once or twice a week, if not more," and they would frequently stay with him overnight on the weekends while Mother worked. At that time, Dever lived in his mother's two-bedroom apartment, which he shared with her, his younger sister, and Stepsister. Dever did not have his own bedroom and would sleep on the couch in the living room. When Faith and Sister stayed overnight, they would sleep together along with Stepsister on a mattress on the floor of the living room next to the couch where Dever slept.

¶4 On May 29, 2015, when Faith was six years old, Dever picked up Faith and Sister for a weekend visit. Dever returned

---

2. "On appeal from a jury verdict, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly, presenting conflicting evidence only as necessary to understand issues raised on appeal." *State v. Rogers*, 2020 UT App 78, n.2, 467 P.3d 880 (quotation simplified).

the girls to Mother's house on May 31. Upon their arrival home, Mother unpacked a suitcase containing the clothes Faith and Sister had worn over the weekend at Dever's house and placed them in the washing machine, but she did not start it. Mother then got the girls ready for bed. As Mother "tucked the girls into bed," Faith informed her that she had left her "special blanket" at Dever's house and that she did not "ever want to go to Dad's house again" because "Dad . . . woke [her] up, . . . took down [her] underwear, and licked [her] butt." At trial, Mother testified that, at that time, Faith used the word "butt" to mean vagina.[3]

¶5     Mother promptly contacted the police to report that Faith had made allegations of sexual abuse. An officer responded and directed Mother to remove the girls' clothing from the washing machine and put it in a paper bag, which she did.

¶6     On June 3, 2015, Faith went to the Children's Justice Center (CJC) for an interview. During the interview Faith told the detective that while she was asleep, "Dad just picked me up, and he told me just take my underwear off, and he licked my butt." Faith also told the detective that she and Sister talked about "when dad licked our butt." The detective then asked if that happened to Sister as well, and Faith responded, "No."

¶7     When asked about visiting her "dad's house," Faith stated she did not "want to go to [her] dad's house" anymore; she explained that while she was at her dad's house he had removed her underwear. But when asked if she could remember where it happened, Faith responded, "I went to mom's house." And

---

3. Mother testified Faith was born prematurely, which had caused her learning difficulties and required that she repeat a grade in school. In particular, Faith struggles "connecting words in sentences," and she "jump[s] the words" around when telling a story. In addition, Faith creates "her own words" for things when she does not know the actual words.

when asked in what room in Dever's house it had occurred, she responded, "[W]e're going to a new place."

¶8    Next, the detective asked Faith if Dever had "ever done anything like that to [her] before." Faith responded in the affirmative, initially indicating that it "happened two times," before immediately changing her answer to "[o]ne time."

¶9    At the close of the interview, Faith again repeated the allegation against Dever and stated that it happened at "his mom's house."

¶10   Shortly after the interview, Dever went to the local police station to speak with the detective. The detective informed Dever about Faith's allegations and inquired about Dever's activities during the relevant timeframe. Dever denied the allegations and told the detective he had worked that weekend and had spent one night out of the house. He also noted that in addition to Faith and Sister, his mother, his sister, and Stepsister had all stayed at his house that weekend. A few days later, the detective asked Dever to provide a DNA sample, which he did.

¶11   Following Faith's interview, the detective went to Mother's house and collected the paper bag that held Faith's and Sister's clothing. The bag's contents were taken to the local lab and sorted; six pairs of underwear were removed and packaged individually. Based on Faith's allegations in the interview, those packages were then sent to the state crime lab to test for saliva.

¶12   The crime lab analyst tested each pair of underwear separately for human alpha-amylase, which is found in saliva and, although not as concentrated, can also be found in tears and fecal material. Four of the six pairs of underwear had stains that tested positive for human alpha-amylase. A small piece of each positive stain was clipped from the underwear; three cuttings were sent to an outside lab for further DNA testing.

¶13　DNA testing revealed that two of the samples were "inconclusive for male DNA." The third sample contained 0.08% male DNA.[4] This sample, in turn, was compared against the reference sample provided by Dever. Based on a comparison of the two samples, the analyst concluded that Dever could not be excluded from the DNA found on the underwear.

¶14　In February 2017, nearly two years after Faith's initial allegations, Dever was charged with one count of sodomy upon a child. Shortly thereafter, Faith disclosed to Mother additional details about Dever's actions, explaining that during her last visit to Dever's house he "took off [her] underwear, licked [her] butt, and poked [her] with his belly button." Mother testified that Faith used "belly button" to mean penis. Mother immediately contacted the detective, and on April 6, 2017, Faith went to the CJC for a second interview.

¶15　During the second interview Faith told the detective Dever "did something to [her]"; he pushed "his belly button . . . in [her] butt . . . and he licked it." The detective asked when it happened, and Faith responded, "Like maybe on a Wednesday, Thursday, Friday. I don't know." She stated that it "made [her] cry" and she "hated it." She also indicated to the detective that it happened "more than one time."

¶16　Faith told the detective Dever touched her with his "belly button" while she was at his house, but she did not identify a

---

4. This sample was from a pair of underwear in size 2T-3T. At trial, Mother testified that Faith had always "been thin," whereas Sister is "short and stockier," and that the girls "fit in the same clothes basically all the time." Although the girls "did not share clothing" at her house, she testified that sometimes the girls would return from Dever's house wearing each other's clothing or underwear. Nevertheless, Mother guessed the size 2T-3T underwear belonged to Sister.

specific room. She initially explained that it happened "[a]t night" while she was "watching a movie" but later stated that it happened "[i]n the morning."

¶17    After Faith's second interview, the State added a second count against Dever for rape of a child. However, concerned about potential delay, the State dismissed the rape charge and proceeded to trial on the sodomy charge alone.

¶18    A trial on the sodomy charge was held in August 2018. Although Dever was present in the courtroom, Faith was not able to identify him. Faith testified the last time she was at Dever's house he "picked [her] up," "pulled" off her clothes, "licked near [her] vagina," and "pushed [her] from his . . . big belly button or something." She further testified that she "didn't like it" and she "was crying." Faith stated this happened in Dever's living room while she was trying to fall asleep. She was sleeping on the floor in the middle of Sister and Stepsister. Thereafter, Faith stated that only Dever and Sister were in the room when it happened. And later, on cross-examination, she explained that when Dever picked her up she was sleeping next to Sister because Stepsister "was in her room and their doors were shut."

¶19    On cross-examination, Faith testified that the abuse happened during the "[m]orning and nighttime" and "[n]ighttime and day." It happened when the sun was up and it was "[b]right" outside and also "when it turned dark."

¶20    Faith also told defense counsel that she was not sick during her last visit to Dever's house. And she stated that after the abuse, Dever took her and Sister back to Mother's house where the girls had breakfast.

¶21    Mother testified that prior to the alleged abuse, Faith was a "very happy," "very social," and "sweet little girl." Faith enjoyed spending time at Dever's house and "always seemed to

have fun" during her visits. However, on the weekend of the alleged abuse, Faith "hid" behind a recliner at Mother's house when Dever came to pick her up for the weekend visit. And after the alleged abuse, Faith told Mother she did not "ever want to go to [Dever's] house again" and she no longer referred to Dever as her father. Furthermore, Faith "couldn't sleep" and would "wake up crying," claiming there were "big monsters over her bed harming her"; she also became "more fearful of things," more "distant," and no longer wanted anyone to touch her. In addition, Mother stated that on the weekend of the alleged abuse, Dever dropped the girls off at her house on Sunday around 7:30 p.m.

¶22     Dever testified in his own defense. He denied the allegations and called them "sick." He also explained that about one month before Faith made the allegations, Mother started dating someone new and Faith stopped referring to Dever as her father.

¶23     Dever testified about his schedule on the weekend of the alleged abuse. On Friday night, he picked Faith and Sister up from Mother's house and took them to his apartment. That night he cooked them dinner and they "[h]ung out for a little while" before he bathed them, changed their clothes, and put them to bed. On Saturday, Dever worked a ten-hour day shift. When he returned home, he cooked the girls dinner, got them ready for bed, and then left them at the apartment with his mother while he went to a bar with his brother. After the bar, he slept at his brother's house until about 6:00 a.m. on Sunday, at which point he returned home and slept until his next ten-hour work shift that started at 9:00 a.m. On Sunday night after work, he fed the girls before returning them to Mother's house.

¶24     Dever's mother and sister also testified for the defense. Dever's mother said that on the weekend of the alleged abuse Faith, Sister, Stepsister, Dever's sister, Dever, and she were all in the apartment. Dever's mother testified that she always slept

with her bedroom door open and when she dressed the girls she always made sure they were wearing the correct clothing. She testified that on Saturday night Faith had "stomach issues." The issues caused Faith to be "fussy"; they lasted "off and on throughout the night" and into Sunday morning. She explained that both Dever's sister and Stepsister helped her take care of Faith that night. Lastly, Dever's mother testified that on Sunday morning, Faith had breakfast at her apartment, not at Mother's house.

¶25    Dever's sister testified that on the weekend of the alleged abuse she was at home. On Saturday night she helped Dever's mother take care of Faith, who "had been up most of the night with an upset stomach."

¶26    After the close of the State's evidence, Dever moved for a directed verdict, arguing (1) the DNA evidence was not enough to establish identity, (2) Faith was unable to identify Dever as the perpetrator of the alleged crimes while she was on the stand, and (3) the State did not meet its burden of proof. The court denied the motion, ruling that Faith "testified about specific information including that a person she identified as dad licked her" and that Dever himself had acknowledged that Faith had spent time with him during a sleepover and had called him "dad" at the time of the alleged events. Based on this, the court determined the State had presented evidence sufficient to "meet the elements of the . . . crime alleged" and therefore denied the motion.

¶27    Following closing arguments, the district court instructed the jury. Included in the instructions was one proposed by the State titled "Testimony of One Witness" (Instruction 19), which stated, "The testimony of a witness to a crime standing alone, if believed beyond a reasonable doubt, is sufficient to convict if the testimony establishes all of the elements of the offense." Dever objected to the instruction as "unnecessary," arguing that it "overemphasize[d]" the testimony of one person. The court

disagreed, finding it "reasonable" in light of another instruction (Instruction 18) addressing witness credibility. Instruction 18 stated, "In deciding whether or not to believe a witness, you may . . . consider anything . . . you think is important. . . . [Y]ou may believe all, part, or none of the witness' testimony. You may believe many witnesses against one or one witness against many."

¶28 The jury convicted Dever of sodomy upon a child. Defense counsel timely moved to arrest judgment or in the alternative for a new trial. The district court denied the motion.


ISSUES AND STANDARDS OF REVIEW

¶29 Dever now appeals, raising several issues for our review. We focus on two of Dever's claims of error. First, Dever argues the district court erred by denying his motion for a directed verdict, claiming the evidence presented at trial was insufficient to support a conviction because Faith's testimony was inherently improbable. "We review the district court's denial of a motion for directed verdict for correctness." *State v. Washington*, 2021 UT App 114, ¶ 8, 501 P.3d 1160 (quotation simplified). However, "where a defendant challenges the denial of a motion for a directed verdict based on the sufficiency of the evidence, the applicable standard of review is highly deferential." *Id.* (quotation simplified). "We will uphold the district court's denial if, when viewed in the light most favorable to the State, some evidence exists from which the elements of the crime could be proven beyond a reasonable doubt." *Id.* (quotation simplified).

¶30 Second, Dever argues the district court erred when it provided an instruction to the jury "that emphasized that a single witness's account could support a conviction." "Claims of erroneous jury instructions present questions of law that we review for correctness." *State v. Jeffs*, 2010 UT 49, ¶ 16, 243 P.3d

1250. "If a jury instruction is erroneous, we will reverse only if the defendant shows a reasonable probability the error affected the outcome of [the] case." *State v. O'Bannon*, 2012 UT App 71, ¶ 15, 274 P.3d 992 (quotation simplified).[5]

## ANALYSIS

### I. Inherent Improbability

¶31　Dever first challenges the district court's denial of his motion for a directed verdict, arguing the evidence was insufficient to prove his guilt beyond a reasonable doubt. In particular, he asserts that Faith's testimony was "inherently improbable" and was therefore insufficient to support his conviction.[6]　He　argues　her　testimony　contained

---

5. Dever also argues we should reverse and remand for a new trial because (1) the district court erred when it dismissed a juror and replaced the juror with an alternate over defense counsel's objection and (2) defense counsel was constitutionally ineffective in two ways. Because we reverse the jury's verdict and remand for a new trial on the ground that the court's jury instruction was erroneous, we need not address these additional arguments because any error in either regard will be remedied by a new trial.

6. The State argues this claim of error was not preserved. At trial, Dever moved for a directed verdict on the grounds that (1) the DNA evidence was not enough to establish identity, (2) Faith was unable to identify Dever in court, and (3) the State had not generally met its burden of proof. Citing *State v. Doyle*, 2018 UT App 239, ¶¶ 12–19, 437 P.3d 1266, the State argues that "[i]nsufficient evidence due to inherent improbability in the crime victim's testimony is an issue that is discrete enough from those Dever raised that the [district] court had no notice that it

(continued…)

"inconsistencies" and "patently false statements" and that it lacked any corroboration.

¶32    Appellate courts "are not normally in the business of reassessing or reweighing evidence," and conflicts in the evidence are typically resolved "in favor of the jury verdict." *State v. Prater*, 2017 UT 13, ¶ 32, 392 P.3d 398 (quotation simplified); *see also State v. Robbins*, 2009 UT 23, ¶ 16, 210 P.3d 288. However, because "a conviction not based on substantial reliable evidence cannot stand," *Robbins*, 2009 UT 23, ¶ 14 (quotation simplified), our supreme court has carved out a narrow exception to this general rule, under which a court may disregard witness testimony as "inherently improbable" when "determining if sufficient evidence exists to sustain a conviction," *id.* ¶ 13.

¶33    In determining whether a witness's testimony may be disregarded as "inherently improbable," our supreme court has identified three factors that merit consideration: "material inconsistencies, patent falsehoods, and lack of corroborating evidence." *State v. Jok*, 2021 UT 35, ¶ 32, 493 P.3d 665; *see also Prater*, 2017 UT 13, ¶ 38; *Robbins*, 2009 UT 23, ¶ 19. However, "inflexible reliance on these factors" is improper. *Jok*, 2021 UT 35, ¶ 32. "The proper test is, and always has been, whether reasonable minds must have entertained a reasonable doubt that the defendant committed the crime." *Id.* (quotation simplified).

---

(…continued)

needed to address it." Although the State's preservation argument may be well taken, we elect to resolve the claim on the merits because we can easily do so in the State's favor. *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 ("If the merits of a claim can easily be resolved in favor of the party asserting that the claim was not preserved, we readily may opt to do so without addressing preservation." (quotation simplified)).

¶34 Thus, where a defendant raises an inherent improbability claim in the context of a directed verdict motion for insufficiency, the court must first evaluate the complained of witness testimony and determine if it is inherently improbable. This determination cannot be based on "a strictly factored test." *Id.* "Rather, when weighing the testimony in light of the other evidence, the testimony of the witness must run so counter to human experience that it renders the testimony inappropriate for consideration in sustaining a finding of guilt." *Id.* ¶ 36 (quotation simplified). If, after engaging in this analysis, the court determines the complained of testimony was indeed inherently improbable, it must disregard that testimony before conducting its sufficiency-of-the-evidence review.

¶35 Dever first claims Faith's testimony was inherently improbable because it "contained internal inconsistencies." Specifically, he contends Faith's testimony was inconsistent regarding the number of times Dever touched her sexually and what time of day the touching occurred. Dever notes that during both CJC interviews, Faith indicated to the detective that Dever touched her both "one time" and "more than one time." And during the second CJC interview, Faith initially claimed the touching occurred at night but later said it happened in the morning.

¶36 Although Faith's accounts were sometimes inconsistent in these regards, we cannot conclude the inconsistencies render her testimony inherently improbable. *See State v. Ruiz*, 2012 UT App 42, ¶ 3, 272 P.3d 185 ("We stress that the court may choose to exercise its discretion to disregard inconsistent witness testimony only when the court is convinced that the credibility of the witness is so weak that no reasonable jury could find the defendant guilty beyond a reasonable doubt." (quotation simplified)). As an initial matter, Utah courts have recognized "it is not unusual that a child's testimony be somewhat inconsistent, especially in sexual abuse cases." *State v. Virgin*, 2006 UT 29, ¶ 38, 137 P.3d 787. And mere "inconsistency alone does not

necessarily make a child's testimony inherently improbable." *State v. Wells*, 2014 UT App 13, ¶ 10, 318 P.3d 1251; *see also id.* (concluding the child witness's testimony was not materially inconsistent where she "describ[ed] fewer incidents [of abuse] when first examined and then describe[ed] slightly more incidents on cross-examination"); *State v. Kamrowski*, 2015 UT App 75, ¶ 18, 347 P.3d 861 (concluding the victim's pre-trial statements and trial testimony were consistent where "she initially told her stepmother about a single instance of abuse but was more forthcoming to investigators or prosecutors" after her initial disclosure); *Robbins*, 2009 UT 23, ¶ 22 (concluding the child witness's "inconsistent accounts regarding the extent of the physical abuse she suffered, her age when the abuse occurred, and what she was wearing at the time of the abuse may alone be insufficient to invoke the inherent improbability exception"). Indeed, inconsistencies in a child's testimony could be "explained by her age and lack of sophistication," *Prater*, 2017 UT 13, ¶ 38, and, in some cases, by the child's "language limitations and cognitive impairment," *Ruiz*, 2012 UT App 42, ¶ 4.

¶37 Dever also claims Faith's accounts were "inconsistent with each other" because the rape allegation was not made during the initial CJC interview and because Faith's emotional reaction to the alleged abuse did not occur until two years after the initial report.

¶38 We disagree with Dever's characterizations on both points. Although Faith disclosed an additional allegation of abuse in the second CJC interview as compared to her initial CJC interview, it does not appear the separate disclosures were actually inconsistent. "Delayed discovery and reporting are common in child sexual abuse cases." *State v. Bair*, 2012 UT App 106, ¶ 47, 275 P.3d 1050 (quotation simplified). The "simple fact" that a child sexual abuse victim "allege[s] additional abuse" after an initial report "does not make [the child's] testimony inherently improbable." *Wells*, 2014 UT App 13, ¶ 9; *see also id.*

(concluding that despite the differences between the child witness's trial testimony and her original reports regarding the number of times she was allegedly abused, the "multiple disclosures were not inconsistent, but merely cumulative, and simply added more details in the later statements"); *State v. Klenz*, 2018 UT App 201, ¶¶ 14, 78, 437 P.3d 504 (concluding the child witness's testimony was not materially inconsistent even though she did not initially disclose all the details of abuse but did so gradually over time).

¶39 So too with Faith's emotional reaction. That Faith's reaction to the abuse was delayed does not render it inconsistent. As this court has recognized, sexual assault victims "display a diverse range of reactions to the harm they suffered." *See State v. Jok*, 2019 UT App 138, ¶ 24, 449 P.3d 610. And in cases where the victim is a child, the "possible psychological effects of sexual abuse" "can occur down the road from the abuse." *State v. Boyer*, 2020 UT App 23, ¶ 46, 460 P.3d 569 (quotation simplified). Moreover, in this case, Faith's emotional reaction began at approximately the same time she made the second disclosure, which included the rape allegation. Thus, her reaction was entirely consistent with the second disclosure.

¶40 Second, Dever claims Faith's testimony was inherently improbable because it contained several "patent falsehoods," including that Sister was also abused by Dever, that Faith "had never been sick" during her last visit to Dever's house, that Stepsister "was in her room and their doors were shut" when the abuse occurred, and that Faith went back to Mother's house before breakfast after the alleged abuse. We are not persuaded these statements are patently false.

¶41 Testimony is "patently false" "only when it is physically impossible or self-evidently false." *State v. Lyden*, 2020 UT App 66, ¶ 19, 464 P.3d 1155. But the alleged falsehoods Dever identifies do not rise to this level. Rather, "[t]he question of which version of [the witnesses'] stories [is] more credible is the

type of question we routinely require juries to answer." *Prater*, 2017 UT 13, ¶ 39.

¶42   Last, Dever claims Faith's testimony was inherently improbable because her "allegations were uncorroborated." In particular, he argues the forensic evidence did not corroborate Faith's allegations.

¶43   But Dever's argument misses the point. "Corroborating evidence sufficient to defeat a *Robbins* claim does not have to corroborate the witness's account across the board, in every particular. It only has to provide a second source of evidence for at least some of the details of the witness's story." *State v. Skinner*, 2020 UT App 3, ¶ 34, 457 P.3d 421; *see also In re J.R.H.*, 2020 UT App 155, ¶ 13, 478 P.3d 56 (concluding that although "the most contested piece of evidence at trial" was uncorroborated, *Robbins* did not apply because "at least portions" of the victim's account were corroborated). Here, there was *some* evidence to support Faith's allegations. Faith told the detective during the first CJC interview that Dever had "licked [her] butt." Based on this statement, Faith's underwear was analyzed for DNA evidence and it tested positive for male DNA that did not exclude Dever. Although the testing did not conclusively prove that Dever was the source of the male DNA, it was sufficient to corroborate at least some of Faith's account.

¶44   Moreover, Mother's testimony regarding Faith's changed demeanor after the alleged abuse is sufficient to corroborate Faith's account. "Corroboration in a [sexual assault] case may consist of circumstantial rather than direct evidence." *State v. Stettina*, 635 P.2d 75, 77 (Utah 1981). "Changes in a victim's behavior, emotional health, and lifestyle can be circumstantial evidence that the alleged act occurred." *State v. Anderson*, 2020 UT App 135, ¶ 26, 475 P.3d 967; *see also State v. Escobar-Florez*, 2019 UT App 135, ¶ 65, 450 P.3d 98 (concluding "significant" changes in the victim's behavior constituted sufficient evidence to "prove that [the defendant] had sexual intercourse with [the

victim]"); *State v. Cosey*, 873 P.2d 1177, 1182 (Utah Ct. App. 1994) (same). Prior to the alleged abuse, Faith and Dever had a good relationship; Faith called Dever "dad," and she frequently spent time at his house, which she enjoyed. However, after the alleged abuse Faith no longer referred to Dever as her father and she told Mother she did not "ever want to go to [Dever's] house again." In addition, Mother testified that after the alleged abuse, Faith "couldn't sleep" and would "wake up crying" because there were "big monsters over her bed harming her." Faith also became "more fearful of things," more "distant," and no longer wanted anyone to touch her. These changes in Faith's behavior are sufficient to corroborate her account.

¶45   In sum, Faith's testimony was not inherently improbable and was therefore sufficient to support a conviction. Although not perfect in every regard, when weighed "in light of the other evidence," the testimony does not "run so counter to human experience" as to render it "inappropriate for consideration in sustaining a finding of guilt." *See Jok*, 2021 UT 35, ¶ 36 (quotation simplified). Thus, Dever cannot show that "reasonable minds must have entertained a reasonable doubt that [he] committed the crime" for which he was convicted. *See id.* ¶ 32 (quotation simplified). And, the district court did not err when it denied Dever's motion for a directed verdict. Accordingly, we now address whether the court erred in instructing the jury.

## II. Jury Instruction

¶46   Dever next argues the district court prejudicially erred when it overruled an objection to Instruction 19, which stated, "The testimony of a witness to a crime standing alone, if believed beyond a reasonable doubt, is sufficient to convict if the testimony establishes all of the elements of the offense." Dever contends this instruction was improper because it "unfairly singled out [Faith's] testimony and commented on the evidence" by suggesting the jury could (1) discount inconsistencies in Faith's accounts and focus on her trial testimony, "standing

alone," and (2) disregard other evidence—including Dever's own testimony—if, "standing alone," Faith's testimony was credible.

¶47    "It is the sole and exclusive province of the jury to determine the facts in all criminal cases." *State v. Salgado*, 2018 UT App 139, ¶ 38, 427 P.3d 1228 (quotation simplified). Thus, a district court "may not comment on the evidence or the credibility of a witness's testimony." *State v. Taylor*, 2005 UT 40, ¶ 22, 116 P.3d 360; *see also* Utah R. Crim. P. 19(f). "Language used in jury instructions should not overemphasize an aspect of the evidence or amount to a comment on the evidence." *Salgado*, 2018 UT App 139, ¶ 38 (quotation simplified). Accordingly, a "jury instruction may amount to an improper comment on the evidence where the court singles out or gives undue emphasis to particular evidence while disregarding other evidence." *Id.*

¶48    Utah appellate courts have yet to address whether a "no corroboration" instruction like Instruction 19 violates the basic rule that jury instructions may not amount to a comment on the evidence. However, courts in other jurisdictions have denounced such instructions, and we find those decisions persuasive.

¶49    For example, in *Gutierrez v. State*, 177 So. 3d 226 (Fla. 2015), the Florida Supreme Court held that the use of a "no corroboration" instruction in a prosecution for sexual battery was improper. In that case, the defendant was charged with sexual battery after the victim reported to police that the defendant had vaginally raped her in the front seat of her car. *Id.* at 227–28. Following the report, a sexual assault nurse conducted a physical exam of the victim that revealed bruises and scratches on her body, including in her vaginal area. *Id.* at 228. At trial, evidence of the exam was admitted along with the testimony of the sexual assault nurse, who opined that the victim's injuries could have occurred during both consensual and nonconsensual sex. *Id.* at 228, 232. Both parties also stipulated that DNA collected from the victim during the exam matched the

defendant's DNA profile. *Id.* at 228. At the close of trial, the prosecutor requested a special instruction "advising the jury that the testimony of the victim need not be corroborated in a prosecution for sexual battery." *Id.* The defendant objected to the instruction, arguing it "singled out the testimony of the victim and could mislead the jury into believing it did not need to weigh or evaluate the credibility of the victim's testimony." *Id.* The district court provided the instruction, and the jury found the defendant guilty. *Id.*

¶50    On appeal, the Florida Supreme Court reversed the conviction, finding the giving of the "no corroboration" instruction was reversible error. *Id.* at 234. The court reasoned that although the instruction was a correct statement of law, it was nevertheless improper because it "constitute[d] a comment on the testimony presented by the alleged victim and present[ed] an impermissible risk that the jury [would] conclude it need not subject the victim's testimony to the same tests for credibility and weight applicable to other witnesses." *Id.* at 229–30. As such, the instruction violated the long-standing prohibition that "a judge may not sum up the evidence or comment to the jury upon the weight of the evidence, the credibility of the witnesses, or the guilt of the accused." *Id.* at 231 (quotation simplified). By providing the "no corroboration" instruction, the judge suggested that "one witness's testimony need not be subjected to the same tests for weight or credibility as the testimony of others," which effectively "bolster[ed] that witness's testimony by according it special status." *Id.* at 231–32. And because the evidence was not a "slam dunk" for either side, a reasonable possibility existed that the erroneous instruction contributed to the defendant's conviction. *Id.* at 233–34 (quotation simplified).

¶51    In addition to improperly commenting on the evidence, the Florida court noted the "no corroboration" instruction was improper because the standard instruction on weighing the evidence was not erroneous and it adequately informed the jury how to evaluate the weight and credibility of each witness's

testimony. *Id.* at 230. Further, the "no corroboration" instruction was likely to confuse and mislead the jury regarding its duty to consider the weight of the testimony and credibility of the victim. *Id.*

¶52   Other jurisdictions have also disapproved of giving no corroboration instructions for similar reasons, namely because such instructions amount to a comment on the evidence and emphasize the victim's testimony over other evidence. *See Burke v. State*, 624 P.2d 1240, 1257 (Alaska 1980) (concluding instruction was improper because it "unduly emphasize[d]" that the victim's testimony need not be corroborated "without similarly indicating that other witnesses' testimony need not be corroborated" and recognizing that in cases "where the defendant has given a statement or taken the stand," such an instruction would be particularly prejudicial "without similarly indicating that the defendant's testimony need not be corroborated"); *Ludy v. State*, 784 N.E.2d 459, 461 (Ind. 2003) ("An instruction directed to the testimony of one witness erroneously invades the province of the jury when the instruction intimates an opinion on the credibility of a witness or the weight to be given to his testimony." (quotation simplified)); *State v. Kraai*, No. 19-1878, 2022 WL 258199, at *2–4 (Iowa Jan. 28, 2022) (finding that a no corroboration instruction was improper because it highlighted the victim's testimony over other testimony, including the defendant's); *In re D.D.R.*, 713 N.W.2d 891, 905 (Minn. Ct. App. 2006) (finding prejudicial error where the district court instructed the jury that the testimony of the victim "need not be corroborated"); *State v. Stukes*, 787 S.E.2d 480, 483 (S.C. 2016) (rejecting a no corroboration instruction and reasoning that such instructions "invite[] the jury to believe the victim, explaining that to confirm the authenticity of her statement, the jury need only hear her speak"); *Veteto v. State*, 8 S.W.3d 805, 816 (Tex. App. 2000) (finding the "effect of an instruction that a conviction could be had only on [the victim's] testimony" singled out her testimony and amounted to "an improper comment on the weight of the evidence"), *abrogated on*

*other grounds by State v. Crook*, 248 S.W.3d 172 (Tex. Crim. App. 2008); *Garza v. State*, 2010 WY 64, ¶ 21, 231 P.3d 884 (holding that a no corroboration instruction was improper because of its "potential to mislead the jury").

¶53　Like the "no corroboration" instructions in these cases, Instruction 19 was improper, and the district court erred in giving it to the jury. Instruction 19 unduly favored the testimony of a single witness—in this case Faith—by suggesting that if believed to be credible, the jury need not consider other evidence. As a result, the jury could have understood the instruction as an indication that Faith's testimony carried more weight than the testimony of other witnesses or evidence or that it should not be held to the same level of scrutiny as other witnesses or evidence. Furthermore, by mentioning only the "testimony of a witness to a crime," the jurors could have believed that the testimony of other witnesses, particularly Dever, *did* require corroborating evidence to be believed.

¶54　Having concluded Instruction 19 was erroneous, we must consider whether it prejudiced Dever.[7] "To reverse a trial verdict, we must find not a mere possibility, but a reasonable likelihood that the error affected the result." *State v. Jeffs*, 2010 UT 49, ¶ 37, 243 P.3d 1250 (quotation simplified). "When

---

7. The parties disagree as to which side bears the burden of proving prejudice. Dever argues the State "should bear the burden to prove that a preserved error was not prejudicial," whereas the State argues Dever bears the burden. Our supreme court has instructed that "the defendant generally bears the burden to demonstrate that the error he complains of affected the outcome of his case." *State v. Reece*, 2015 UT 45, ¶ 33, 349 P.3d 712; *see also State v. Leech*, 2020 UT App 116, ¶ 43 n.7, 473 P.3d 218 ("Except in cases of constitutional error, Utah law places the burden on the defendant to prove that a preserved error is harmful."). Thus, Dever bears the burden here.

reviewing jury instructions, we look at the jury instructions in their entirety and will affirm when the instructions taken as a whole fairly instruct the jury on the law applicable to the case." *State v. Lambdin*, 2017 UT 46, ¶ 41, 424 P.3d 117 (quotation simplified).

¶55 Dever argues he was prejudiced by Instruction 19 because the evidence presented at trial "was not overwhelming" as to his guilt and the case "was ultimately a credibility contest—the kind of case where a 'judge's thumb on the scale to lend an extra element of weight to the victim's testimony' could make all the difference." (Quoting *Gutierrez*, 177 So. 3d at 232.) We agree. The forensic evidence admitted by the State did not conclusively identify Dever as the source of the DNA on the underwear. Indeed, during closing argument, the State acknowledged that "this is not the type of DNA evidence that says 'Oh, absolutely, it's him. It's the defendant.'" Furthermore, it is unknown whether the underwear stained with the DNA belonged to Faith or Sister; and in any event, underwear belonging to both girls was placed together in a suitcase, then a washing machine, and then a paper bag before being taken for testing. Likewise, Faith's accounts were, at times, inconsistent, and some details cast doubt on her credibility.

¶56 Moreover, we are not persuaded by the State's argument that other jury instructions "directed the jury to consider *all* the evidence" thereby rendering any defect in Instruction 19 harmless. To the contrary, when read along with the other jury instructions about assessing witness credibility, Instruction 19 may have actually confused or misled the jury. For example, Instruction 18—the court's model jury instruction regarding witness credibility—correctly informed the jurors how to assess witness credibility and weigh witness testimony. *See, e.g.*, *State v. Schmidt*, 757 N.W.2d 291, 297 (Neb. 2008) (concluding that a no corroboration instruction was "redundant and unnecessary" when considered together with the general witness credibility instructions). But by giving Instruction 19, the court confused

matters by overemphasizing the testimony of "a witness to a crime."

¶57 In sum, we agree with the district court that the State and Dever both raised "some good points," "[i]t was a triable case on each side, and the verdict was not clear until the outcome of the trial." There was not a "mountain of evidence" against Dever; rather, the case ultimately hinged on witness credibility. By giving Instruction 19, however, the court impermissibly highlighted Faith's testimony and suggested that if believed to be credible, the jury need not consider other evidence. This was especially problematic here because Dever's main trial strategy "was to focus on inconsistencies between [Faith's] account at trial and her accounts in the CJC [interviews]" rather than to present evidence corroborating his account. Given the conflicting evidence before the jury, particularly Dever's own testimony, we cannot say that absent Instruction 19 the jury would have accorded Faith's testimony the same weight. Accordingly, we conclude that without Instruction 19 there is a reasonable likelihood a jury would have returned a verdict more favorable to Dever.

CONCLUSION

¶58 The district court correctly denied Dever's motion for a directed verdict because Faith's testimony was not inherently improbable and was sufficient to support Dever's conviction. However, the district court erred in instructing the jury, and because the evidence that Dever committed the crime for which he was charged was not overwhelming, our confidence in the jury's verdict is undermined. Therefore, we reverse Dever's conviction and remand for a new trial.

―――――――