**2025 UT App 119**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
RODOLFO GARCIA,
Appellant.

Opinion
No. 20231072-CA
Filed August 7, 2025

Third District Court, Salt Lake Department
The Honorable Heather Brereton
No. 211911916

Nathalie S. Skibine, Attorney for Appellant

Derek E. Brown and Natalie M. Edmundson,
Attorneys for Appellee

JUDGE AMY J. OLIVER authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and JOHN D. LUTHY
concurred.

OLIVER, Judge:

¶1     Rodolfo Garcia appeals his convictions on six counts of aggravated sexual abuse of a child and one count of enticing a minor. First, Garcia argues that the district court erred in denying his motion for a directed verdict on two of the counts of aggravated sexual abuse of a child because there was insufficient evidence to convict him. Second, Garcia argues the district court erred when it admitted expert testimony that addressed the factors that play into delayed reporting of child sexual abuse. Finally, Garcia asserts it was plain error for the district court to inform the jury of the offense classifications of the charges against him. We affirm Garcia's convictions.

## BACKGROUND[1]

¶2     When Alexis and Mila[2] were in elementary school, their mother's (Mother) boyfriend, Garcia, began living with them. Mother later married Garcia after becoming pregnant with their son. Eventually, Alexis and Mila began to see Garcia as a father figure and called him "apa," "an abbreviation of dad in Spanish."

### *The Abuse*

¶3     Within a year of moving in with their family, Garcia began sexually abusing Alexis and Mila. His abuse continued for years. Even though Alexis and Mila told Mother about some of Garcia's conduct, the behavior continued.

¶4     **Alexis.** Garcia began slapping Alexis's buttocks around the time he married Mother. Garcia would smack Alexis's buttocks when she would walk past him or any other time he "had a chance to." Alexis did not think much of it at first because she was "little," and she thought it was just "a weird quirky trait" because his family said it was "what he always did." As Alexis got older, Garcia began making comments when he slapped her buttocks, such as "It's getting bigger. Your butt's getting bigger" or "Your butt looks good in those jeans." When Alexis told Garcia to stop, it would "evolve into a fight" and Garcia would ignore her for days or weeks. Alexis told Mother about the buttocks slapping, and Mother's advice was for Alexis to avoid putting herself in situations where Garcia could slap her buttocks.

---

1. On appeal from a jury verdict, "we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly, and we present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Herrera*, 2025 UT App 1, n.2, 563 P.3d 416.

2. Alexis and Mila are pseudonyms.

¶5      When Alexis was in fifth grade, Garcia also started flicking her breasts over her clothes around twice a week. When he flicked her breasts, Garcia would make comments, such as "They're growing" or "They're getting bigger."

¶6      Garcia also touched Alexis's vagina with his hand under her clothes on multiple occasions.[3] Garcia first touched her vagina when she was in third or fourth grade and watching television on the couch in the living room while Mother was on a trip to Mexico. The second time occurred when Alexis was in fourth or fifth grade. Alexis woke up to Garcia entering the bedroom she shared with Mila. Alexis got up, and Garcia put his hand under her pajamas and touched her vagina. Garcia continued to enter her room at night and touch her vagina under her clothes "sporadic[ally]," "[w]henever . . . he wanted to."

¶7      Garcia's conduct "felt wrong" to Alexis, but she did not know it was wrong until she took a sex education class at school. Alexis told a friend in middle school about Garcia's conduct, but her friend did not believe her. Alexis did not tell Mila about Garcia's conduct because it was "very obvious" that Garcia and Mila were close and she did not know if Mila would believe her. She did not disclose the abuse to Mother right away because she did not want to "crush" Mother's dream of having a family and her own dream of having a father.

¶8      **Mila.** Garcia also slapped Mila's buttocks almost "everyday" for the "whole time that he was a part of [their] family." Garcia repeatedly made sexualized comments when he slapped Mila's buttocks, such as "Oh, you're thick." He would also smack her buttocks when she did something good or played

---

3. Because the details of these allegations of abuse are not necessary to our determination of the legal issues raised on appeal, we include only an abbreviated version of the facts sufficient to provide context to the reader.

well in a soccer game. The buttocks slapping made Mila uncomfortable, and she told Mother "to try and talk to him to get it to stop." After Mother talked to Garcia, he would stop slapping Mila's buttocks for a period of time but ultimately would start doing it again. On one particular occasion, to try to get Garcia to stop slapping her buttocks, Mila put a metal bracelet in her right back pocket. When Garcia slapped Mila's buttocks, he felt the bracelet and asked her "[w]hy [she had] that in there."

¶9 Garcia also sent Mila several inappropriate text messages that made her feel "very uncomfortable." When she was eleven years old, Garcia sent her a text that said, "Goodbye my heaven. I hope you dream with the little angels. You'll tell me tomorrow how I look naked," which Mila took to mean that if she saw Garcia in her dreams, he would be naked, and she should tell him he looked good. Mila told Mother about the text message, but nothing changed. Two years later, Mila received texts from Garcia that said, "Hey, don't be mean. When you're touching your little parts don't moan so much. You just make me horny," and, "[N]ext time, invite me so that we can at least finish at the same time." Mila also told Mother about these texts and asked her to do something, but again nothing changed.

*The Reporting*

¶10 When Alexis was fourteen, she began skipping school. Her school called Mother, who was upset and anticipated a negative reaction from Garcia once she told him Alexis had been skipping class. Alexis explained that she skipped class because she was stressed about school and "stressed about having to go home and fix things with [Garcia]," and she did not even "want to look at him." When Mother asked why Alexis did not want to look at Garcia, Alexis told her that Garcia "touched [her] multiple times."

¶11 Mother then picked up Mila from school "in case [Garcia] did something to her as well," and immediately reported the alleged touching to police. Both Alexis and Mila gave statements

to the police, and a detective (Detective) interviewed both girls at the Children's Justice Center.

¶12 Detective also interviewed Garcia. Garcia denied touching Alexis's vagina, but he admitted slapping Alexis and Mila on the buttocks, even though Mother thought it was inappropriate. Garcia stated he loved his stepdaughters, saw them as his own daughters, and did not feel the buttocks slapping was inappropriate because "it was just like slapping his son on the butt" or like what he did with his sport teammates. When asked about the text messages he sent to Mila, Garcia said he intended to "scare" her into talking to Mother about masturbation. Garcia was later charged with six counts of aggravated sexual abuse of a child, all first-degree felonies, and one count of enticing a minor, a second-degree felony.

*The Pretrial Proceedings*

¶13 Prior to trial, the State gave notice that it intended to call an expert witness (Expert) to testify about forensic interviewing, memory and reactions of child abuse victims, disclosures of child abuse victims, and close relationships between alleged victims and abusers. Expert would testify as a "blind expert," meaning he had not met Alexis or Mila and did not know anything about the facts of the case. Garcia's trial counsel (Counsel)[4] moved to exclude Expert, arguing that Expert's testimony was not necessary to assist the trier of fact under rule 702 of the Utah Rules of Evidence and was substantially more prejudicial than probative under rule 403 of the Utah Rules of Evidence.

¶14 After holding an evidentiary hearing, the district court ruled that Expert's testimony would be admissible with limitations. The district court found Expert was qualified as an

---

4. Although two attorneys represented Garcia at trial, we need not differentiate among them on appeal. Thus, we refer to them collectively as "Counsel" throughout this opinion.

expert and that although many people are aware of delayed disclosure, the court did not know for certain that members of this jury would be aware of it. The district court therefore thought it could be helpful for the jurors to hear Expert's testimony to "understand they need to judge the credibility of this child based on this child and not based on expectations of how they believe a survivor of child sex abuse . . . should act." But the district court limited Expert's testimony to the reasons for delayed disclosure and prohibited Expert from testifying about either how common delayed disclosure is or a "profile" of a child who has been abused.

*The Trial*

¶15  The case proceeded to a three-day jury trial. After the jury was sworn in, the court read the information to the jury. When the court read the information, it also read the offense classification for each of the charges against Garcia. Neither party objected.

¶16  The State called several witnesses in its case in chief, including Alexis, Mila, Expert, Mother, and Detective. Alexis and Mila testified about the abuse as described above, and Detective testified about her interviews with Alexis and Mila after they reported the abuse and her interview with Garcia.

¶17  Expert testified about physiological responses to trauma, how trauma affects memory, and factors impacting disclosure of abuse. Expert testified that the factors that can play into whether a child discloses sexual abuse include age, whether the child thinks "he or she will be believed," whether the alleged abuser has threatened the child, the number of times the abuse happened, and how close the child is to the person who allegedly abused them. The State also asked Expert whether child victims ever continue to have "contact with [the] alleged abuser even after the abuse occurred" and about "factors" connected to such continued contact. Counsel objected, but the court overruled the objection, and Expert answered that child victims do sometimes maintain

contact with their alleged abusers and that factors that play into such continued contact include the alleged abuser living with the child, feelings of affection toward the alleged abuser, and the child's lack of autonomy.

¶18 The State then called Mother to testify. Mother testified that she often observed Garcia slapping Alexis and Mila on the buttocks. She also testified that when she asked him to stop, Garcia would argue with her and tell her she was "exaggerating or imagining things." Mother explained that she confronted Garcia after Mila showed her the first text message he sent her and kicked Garcia out of the house, but after a week she let him back in the house because she did not want their son to grow up without a father. And Mother stated that after Mila showed her the second text message, Mother again kicked Garcia out of the house, but she let him come back because their son missed him.

¶19 At the close of evidence and outside of the presence of the jury, the State moved to amend the enticement count from a second-degree felony to a class B misdemeanor. After the court agreed to make the amendment, Counsel asked the court how it wanted to handle the amendment with the jury because when the court read the information the count was listed as a felony. Counsel stated they did not "think [the jury was] going to notice" the change and, accordingly, did not object to the court's proposal to make the amendment by interlineation. The court agreed, finding it was "very unlikely the jury would recall" the discussion about the level of offenses from the beginning of the trial.

¶20 Counsel then moved for a directed verdict on the two counts of aggravated sexual abuse of a child that resulted from Garcia's slapping Alexis's and Mila's buttocks.[5] Counsel argued the State failed to show that Garcia had the requisite intent to

---

5. Counsel also moved for a directed verdict on the enticement charge, but that ruling is not at issue on appeal.

"sexually gratify" because he would slap everyone's buttocks, including non-household members. The district court denied the motion, stating that when it viewed the evidence in a light most favorable to the State there was sufficient evidence to infer that "Garcia's intent was to arouse or gratify his sexual desire."

¶21   When the jury returned, the court read the jury instructions. One of the instructions stated, "In making your decision, do not consider what punishment could result from a verdict of guilty. Your duty is to decide if the defendant is guilty beyond a reasonable doubt. Punishment is not relevant to whether the defendant is guilty or not guilty." The State and Counsel then gave closing arguments.

¶22   The jury found Garcia guilty on all seven counts. He was sentenced to fifteen years to life for each of the six first degree felonies—with counts one through five to run concurrently and count six to run consecutively to counts one through five—and to a suspended term of 180 days in jail for count seven, the class B misdemeanor.

ISSUES AND STANDARDS OF REVIEW

¶23   Garcia raises three issues on appeal. First, Garcia asserts the district court erred in denying his motion for a directed verdict because there was insufficient evidence to convict him on the two counts of aggravated sexual abuse for the buttocks slaps of Alexis and Mila. Appellate courts review a district court's denial of a motion for a directed verdict for correctness. *See State v. Dever*, 2022 UT App 35, ¶ 29, 508 P.3d 158. "We will uphold the district court's denial if, when viewed in the light most favorable to the State, some evidence exists from which the elements of the crime could be proven beyond a reasonable doubt." *Id.* (cleaned up).

¶24   Second, Garcia argues the district court erred when it admitted Expert's testimony that addressed the factors that play

into delayed reporting of sexual abuse and reasons that children maintain contact with alleged abusers. District courts have "wide discretion in determining the admissibility of expert testimony, and such decisions are reviewed under an abuse of discretion standard." *State v. Martin*, 2017 UT 63, ¶ 19, 423 P.3d 1254 (cleaned up).

¶25    Third, Garcia asserts that it was plain error for the district court to inform the jury of the offense levels for each of the seven counts he was charged with. "The plain error standard of review requires an appellant to show the existence of a harmful error that should have been obvious to the district court." *State v. Gallegos*, 2018 UT App 112, ¶ 12, 427 P.3d 578.

ANALYSIS

I. Motion for a Directed Verdict

¶26    Garcia challenges the district court's denial of his motion for a directed verdict, arguing there was insufficient evidence to convict him on the two counts of aggravated sexual abuse for the buttocks slaps of Alexis and Mila. Specifically, Garcia asserts that he lacked the requisite intent to "arouse or gratify the sexual desire of any person" required under the statute.

¶27    A district court may grant a defendant's motion for a directed verdict dismissing any count in the information if "the evidence is not legally sufficient to establish the offense charged therein or any lesser included offense." Utah R. Crim. P. 17(o). We uphold a district court's denial of a motion for a directed verdict if, "when viewed in the light most favorable to the State, some evidence exists from which the elements of the crime could be proven beyond a reasonable doubt." *State v. Dever*, 2022 UT App 35, ¶ 29, 508 P.3d 158 (cleaned up). We conclude, for the reasons discussed below, that the State presented sufficient evidence of Garcia's intent at trial.

¶28    Our legislature has made "clear that touching another person's buttocks may constitute a sex crime." *State v. Rallison*, 2023 UT App 34, ¶ 14, 528 P.3d 1235 (citing Utah Code §§ 76-5-404(2), 76-9-702.1(1), 76-5-404.1(2)). And "in most cases, proof of a sexual act will itself provide a basis from which a factfinder may permissibly rely on logic and human experience to infer intent beyond a reasonable doubt." *State v. Whitaker*, 2016 UT App 104, ¶ 18 n.8, 374 P.3d 56. Slaps to the buttocks—which "are generally considered to be private or intimate body parts"—"almost always carr[y] a sexual connotation" and can on their own provide a basis for a factfinder to infer sexual intent, especially when they make the recipient uncomfortable and are accompanied by sexualized comments. *Rallison*, 2023 UT App 34, ¶ 15.

¶29    Garcia argues that the buttocks slaps were "an expression of camaraderie" and similar to buttocks slaps at a sporting event. However, he fails to explain how extremely frequent buttocks slapping that regularly occurred in the home and made his stepdaughters uncomfortable is similar to a "'way to go' bump of encouragement in the middle of a sporting event," especially when the buttocks slaps were frequently accompanied by sexual comments rather than words of encouragement. *Id*. Indeed, "[s]exual comments inherently carry sexual connotations." *Id*. And Garcia has no explanation for his sexualized comments that accompanied the buttocks slaps, other than to call the statements "descriptive."

¶30    Further, Alexis and Mila were clearly uncomfortable with Garcia slapping their buttocks; they both told Mother about it, and Mila even went so far as to put a metal bracelet in her pocket to deter Garcia from slapping her buttocks. *See id*. ¶ 16 (discussing how employees testified that the supervisor's buttocks slapping made them uncomfortable, "presumably because of the intimate nature of the touching"). Thus, a jury could reasonably infer that Garcia acted with sexual intent when he slapped Alexis's and Mila's buttocks based on the conduct occurring repeatedly in their

home, accompanied by sexual comments that made them uncomfortable.

¶31 Therefore, the district court did not err in denying Garcia's motion for a directed verdict.

## II. Admission of Expert's Testimony

¶32 Garcia next argues that the district court erred when it denied his motion in limine and allowed Expert to testify about the "factors that play into late disclosure" and an individual "maintaining contact with an alleged abuser." Garcia asserts the district court should not have allowed Expert's testimony because it "was not helpful to understanding the evidence and worked instead to cause unfair prejudice through bolstering the testimony of the stepdaughters." Garcia argues that the reasons a child may delay disclosure of sexual abuse and maintain contact with an alleged abuser fall "within the understanding of the average juror" and therefore Expert's testimony was not helpful. We disagree that Expert's delayed disclosure testimony would not have been helpful to the jury, and we determine that even if the court abused its discretion by admitting Expert's testimony regarding factors that contribute to a child victim maintaining contact with an alleged abuser, its admission was harmless.

¶33 Rule 702(a) of the Utah Rules of Evidence allows an expert witness to testify to "scientific, technical, or other specialized knowledge" that "will help the trier of fact." "Under this rule, courts should generally exclude testimony if the testimony is within the knowledge or experience of the average individual." *State v. Martin*, 2017 UT 63, ¶ 29, 423 P.3d 1254 (cleaned up). However, "it is not necessary that the subject of the expert testimony be so erudite or arcane that the jurors could not possibly understand it without the aid of expert testimony, nor is it a requirement that the subject be beyond the comprehension of each and every juror." *Id.* ¶ 30 (cleaned up).

¶34　Here, the district court decided to allow Expert's testimony as to the reasons for delayed disclosure because even though "a lot of people are aware of delayed disclosure," members of this jury may not be aware of it. The district court also found Expert's testimony could help the jurors "understand they need to judge the credibility of this child based on this child and not based on expectations of how they believe a survivor of child sex abuse . . . should act." Expert's testimony here is similar to the expert's testimony in *Martin*, where our supreme court held that it was within the district court's discretion to allow expert testimony regarding "why child victims make inconsistent disclosures" because it "would be helpful to some—if not all—jurors." *Id.* Therefore, we conclude the district court acted within its discretion by allowing Expert's testimony about delayed disclosure where it could be helpful to at least some jurors. Accordingly, the district court did not abuse its discretion in allowing Expert's testimony on delayed disclosure.

¶35　With respect to Expert's testimony as to the reasons that a child may maintain contact with an alleged abuser, we believe it is a closer call as to whether that testimony was helpful to the jury. Alexis and Mila reported the abuse by Garcia—their stepfather who lived with them in the same house—to Mother multiple times. And although Mother kicked Garcia out of the house twice, she quickly invited him back. Garcia argues that "[n]o expert testimony was needed to explain that [Mother's] choice would create continued contact between" Alexis, Mila, and Garcia. But even assuming that this would have been obvious to the jury and Expert's testimony should have been excluded, we conclude that Garcia has not met his "burden . . . to prove that there is a reasonable likelihood that the verdict would have been different if the [district] court had [not] allowed the expert testimony." *Steffensen v. Smith's Mgmt. Corp.*, 862 P.2d 1342, 1347 (Utah 1993). It is difficult to see the jury reaching a not guilty verdict in the absence of Expert's testimony on this issue. The testimony itself was very brief; it consisted of only three questions, two of which

Expert answered with a simple, "Yes." And even if the jury did not hear this brief testimony, the jury would have still heard strong evidence of Garcia's guilt. It would have heard Alexis's and Mila's testimony about the abuse, Mother's testimony about their reports to her, and Garcia's testimony admitting much of the conduct. Thus, any abuse of discretion in permitting Expert's testimony was harmless because there is no reasonable likelihood it would have resulted in a different outcome.

¶36    Garcia further argues that Expert's testimony improperly bolstered Alexis's and Mila's testimony. Expert witnesses engage in impermissible bolstering when they testify that a witness's behavior matches a "profile for victims of sexual abuse," offer probabilities, or directly opine on the truthfulness of a witness's testimony. *State v. Boyer*, 2020 UT App 23, ¶¶ 44, 47, 460 P.3d 569. Here, the district court expressly prohibited Expert from testifying in terms of probabilities or offering a "profile" of a child who has been sexually abused. And because Expert testified as a "blind expert" who was unaware of the facts and allegations in this case, he did not opine on the truthfulness of any of the witnesses or seek to connect any of his testimony about delayed disclosure or reasons why children continue to have contact with an alleged abuser to Alexis's or Mila's conduct. *See id.* ¶ 47 (holding there was no impermissible bolstering when the "psychiatrist did not address or opine, even hypothetically, whether the evidence presented . . . was indicative of abuse and confirmed that he had never met the victim and was not aware of . . . the allegations against" the defendant); *Martin*, 2017 UT 63, ¶ 33 (concluding there was no improper bolstering when the forensic interviewer testified to "general behavioral characteristics" of child sex abuse victims but did not "seek to connect her testimony" about these characteristics to the alleged victims in the case). Thus, Expert's testimony did not amount to impermissible bolstering.

## III. Offense Classifications

¶37    Finally, Garcia argues that the district court erred when it informed the jury of the offense classifications for all the charges. Because Garcia did not object when the court informed the jurors of the offense classifications for the charges against him, the issue is unpreserved, and Garcia asks us to review it for plain error.

¶38    "To prevail on plain error review, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the [district] court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant." *State v. Cesspooch*, 2024 UT App 15, ¶ 7, 544 P.3d 1046 (cleaned up), *cert. denied*, 550 P.3d 994 (Utah 2024). If any of the three requirements are not met, "plain error is not established." *Id.* ¶ 9 (cleaned up). Informing the jury of a classification of an offense is an obvious error because "the classification of an offense is directly tied to its punishment" and punishment is "not a proper matter for jury consideration." *Id.* ¶¶ 11–12. Therefore, we examine whether informing the jury of the offense classifications was harmful.

¶39    To prove that an obvious error is harmful, Garcia "must show that absent the error, there is a reasonable likelihood of a more favorable outcome." *Id.* ¶ 14 (cleaned up). This analysis asks "whether we remain confident that the verdict would be the same" if the district court had not informed the jury of the offense classifications. *Id.* (cleaned up). After considering the circumstances here, we do not believe there is a reasonable likelihood of a more favorable outcome without the error.

¶40    First, if "proof of a defendant's guilt is strong, the challenged conduct or remark will not be presumed prejudicial, but when the evidence is less compelling we will more closely scrutinize the conduct." *Id.* ¶ 16 (cleaned up). Here, Garcia admitted to slapping Alexis's and Mila's buttocks even though he knew Mother thought it was inappropriate and told him to stop.

He also admitted sending sexual texts to Mila. Although Garcia denied other allegations, there is still strong evidence pointing toward his guilt, so we will not presume that the district court informing the jury of the offense classifications was prejudicial.

¶41 Next, we determine whether informing the jury of the offense classifications harmed Garcia. *Id.* ¶ 7. Garcia argues that first-degree felonies would have "stood out to the jury" due to their seriousness and would have informed the jury that "each count was on par with offenses like murder." While it is possible that learning the classifications for the offenses had the potential to harm Garcia, it is just as likely that informing the jury of the offense classifications here was helpful to Garcia. This is so because hearing that Garcia was charged with first-degree felonies for conduct that Garcia argued was akin to a buttocks slap at a sporting event could make it look like the State was reaching and overcharged Garcia. *See id.* ¶ 17. It is also possible that informing the jury of the offense classifications at the beginning of the trial had no effect on the jury.

¶42 As in *State v. Cesspooch*, 2024 UT App 15, 544 P.3d 1046, the offense classifications here were presented to the jury only once, in the middle of an elements instruction as part of a broader set of preliminary jury instructions at the beginning of trial, making them unlikely to stand out to the jury. *See id.* ¶ 18. But even more compelling here, neither Counsel nor the district court thought the jury would remember having been informed of the offense classifications. During a conference outside of the presence of the jury, the court and attorneys discussed the implications of modifying the enticement charge mid-trial because it would change the offense classification. Significantly, during that discussion Counsel commented that the jury probably would not notice the change in classification, and the court agreed, stating it was "very unlikely that the jury would recall" the offense classifications from the beginning of trial. But even if the jury was aware of the offense classifications, the court provided a final jury

instruction informing the jury to not consider punishment because "[p]unishment is not relevant to whether the defendant is guilty or not guilty." *See State v. Suhail*, 2023 UT App 15, ¶ 142 ("Jurors are presumed to have followed a trial court's instructions."). Thus, we think it is quite unlikely that the jury would have remembered and focused on the offense classifications during deliberations.

¶43 Accordingly, the district court did not plainly err by informing the jury of the offense classifications because Garcia has not demonstrated prejudice.[6]

CONCLUSION

¶44 The district court did not err in denying Garcia's motion for a directed verdict for two of the counts of aggravated sexual abuse of a child that arose from Garcia slapping Alexis's and Mila's buttocks. The district court also did not abuse its discretion by allowing Expert to testify. Finally, although it was an obvious error for the district court to inform the jury of the offense classifications, Garcia has not shown that the error prejudiced him. We therefore affirm Garcia's convictions.

––––––––––

6. Garcia also raises a cumulative error challenge on appeal. "Under the cumulative error doctrine, we will reverse only if the cumulative effect of the several errors undermines our confidence that a fair trial was had." *State v. Centeno*, 2023 UT 22, ¶ 85 n.10, 537 P.3d 232 (cleaned up). Because we concluded that the district court did not err when it denied Garcia's motion for a directed verdict, *see supra* Part I, and did not abuse its discretion when it denied Garcia's motion in limine and allowed Expert's testimony, *see supra* Part II, the cumulative error doctrine is inapplicable here. *See State v. Alvarado*, 2023 UT App 123, ¶ 39 n.8, 538 P.3d 633 (holding that the cumulative error doctrine is inapplicable when a single error occurs).